# United States Court of Appeals for the Federal Circuit

————————————

**WORDTECH SYSTEMS, INC.,**
*Plaintiff-Appellee,*

**v.**

**INTEGRATED NETWORKS SOLUTIONS, INC.,**
(DOING BUSINESS AS **INTEGRATED NETWORK SOLUTIONS CORP.**, ALSO KNOWN AS **INTEGRATED NETWORK SOLUTIONS, INTEGRATED SYSTEMS, INTERNET NETWORK STORAGE COMPANY** AND **INSC), NASSER KHATEMI,** AND **HAMID ASSADIAN,**
*Defendants-Appellants,*

**and**

**EHTERAM GHODSIAN, SHOHREH JAVADI, MICHAEL F. ELLSWORTH,**
AND **BRIAN J. DEAN,**
*Defendants.*

————————————

2009-1454

————————————

Appeal from the United States District Court for the Eastern District of California in case No. 04-CV-1971, Judge Morrison C. England, Jr.

————————————

Decided: June 16, 2010

————————————

CHRISTIAN J. MARTINEZ, General Counsel, Wordtech Systems, Inc., of Concord, California, argued for plaintiff-appellee. With him on the brief was RICHARD ESTY PETERSON, Richard Esty Peterson, Patent Attorney, of Pacifica, California.

CHRIS GIBSON, Boutin, Gibson Di Gusto Hodell Inc., of Sacramento, California, argued for defendants-appellants. With him on the brief was MICHAEL E. CHASE.

———————————

Before MAYER, GAJARSA, and LINN, *Circuit Judges*.

LINN, *Circuit Judge*.

This is a patent infringement case involving technology for automated duplication of compact discs. Wordtech Systems, Inc. ("Wordtech") sued Integrated Networks Solutions, Inc. ("INSC") and its employees Nasser Khatemi and Hamid Assadian (collectively "Defendants") in the District Court for the Eastern District of California for infringement of U.S. Patents No. 6,141,298 ("'298 patent"), No. 6,532,198 ("'198 patent"), and No. 6,822,932 ("'932 patent"). A jury found INSC, Khatemi, and Assadian each liable for direct infringement, contributory infringement, and inducement of infringement, and awarded damages. Khatemi and Assadian appeal the liability verdicts against them as individuals; all three defendants appeal damages and the district court's denial of their motion for leave to amend their answer to allege invalidity defenses. Because the jury instructions lacked legal tests necessary to determine Khatemi and Assadian's individual liability, and because the damages verdict conflicts with the clear weight of the evidence, we *reverse* the district court's denial of Defendants' motion for new trial and *remand*. Because the district court did not

abuse its discretion by denying Defendants' motion for leave to amend, we *affirm* that ruling.

BACKGROUND

The three asserted patents share a common parent application and cover "Programmable Self-Operating Compact Disk Duplication Systems." Wordtech alleged that Defendants infringed the patents by modifying and selling disk duplication devices called "Robocopiers," model numbers 600 and 8000. The accused devices copy video files from computer memory to multiple discs. Wordtech also alleged that INSC, Khatemi, Assadian, and other "INSC personnel" contributorily infringed and induced third parties to infringe "by selling infringing products to them." First Am. Compl. ¶ 27.

INSC was founded by Khatemi's mother, Ehteram Ghodsian, and incorporated in Nevada on March 17, 1994. Nevada law requires corporations to file annual forms that include the names and addresses of officers and directors. *See* Nev. Rev. Stat. § 78.150 (2009). Failure to file the annual forms results in revocation of the corporate charter, which cannot be reinstated after five consecutive years of noncompliance. *Id.* §§ 78.175, 78.180. INSC filed annual lists of corporate officers in 1994 and 1995, identifying Khatemi as President and as a Director, respectively.[1] However, after 1995, INSC did not file the mandatory annual statements in Nevada. On November 3, 2006, after Wordtech filed suit (on September 22, 2004),

---

[1] The record contains additional copies of INSC's 1994 and 1995 forms that do not list Khatemi under any position. Wordtech claims that these copies were "falsified." Wordtech's Br. 11. On appeal, Defendants admit that the 1994 and 1995 filings listed Khatemi's name. Defs.' Principal Br. 17.

INSC filed a "Certificate for Revival for a Nevada Corporation."

Khatemi and Assadian worked for INSC but denied that they served as officers. Khatemi testified that he was a "salesman," that his "specialty is software and software solution," and that he sold Robocopier 600 and 8000 models. Reporter's Tr., Trial Proceedings, Nov. 4, 2008, 144:20-146:21. Assadian described himself as an engineer responsible for INSC "product development." *Id.*, Nov. 5, 2008, 109:13-19; *id.*, Nov. 10, 2008, 46:6-23. Khatemi said, "We generally never had titles at the company," but identified Assadian as the company representative at the time of trial. *Id.*, Nov. 4, 2008, 151:20-25, 136:19-24. According to Assadian, INSC had at most "20 and maybe 15" employees between 2000 and 2005, and only two full-time employees—himself and Khatemi—at the time of trial. *Id.*, Nov. 10, 2008, 11:6-12, 22:14-18. Assadian also testified that "mostly Mr. Khatemi and myself" were responsible for the company, but neither held an office. J.A. 537.

Wordtech named the San Juan Unified School District ("School District") of Carmichael, California as a co-defendant for allegedly purchasing and using INSC Robocopiers. First Am. Compl. ¶ 28. In response, the School District pleaded "Patent Invalidity" as an affirmative defense. San Juan Unified Sch. Dist.'s Answer to First Am. Compl. 10. However, INSC, Khatemi, and Assadian did not plead invalidity defenses or counterclaims. The School District later settled with Wordtech and left the lawsuit. The remaining defendants learned of this settlement on January 23, 2007 and moved to amend their answer to allege invalidity defenses on February 13, 2007. The district court denied this motion. *Wordtech Sys., Inc. v. Integrated Network Solutions, Inc.*, No. 04-CV-1971 (E.D. Cal. Mar. 22, 2007) (order denying motion).

The district court conducted a jury trial on Wordtech's infringement theories. The jury answered questions involving infringement on a sixteen-page verdict form. Part I of the verdict form, "INFRINGEMENT," asked as to each defendant whether Wordtech proved that the Robocopier 600 and 8000 infringed each of the asserted claims of the three patents, but only displayed check boxes for "(A) Inducing Infringement in the U.S." and "(B) Contributing to infringement in the U.S." Joint Verdict Form 2-14. Part II, "Infringement Detail," asked whether Wordtech proved that "any valid claim of these patents" was infringed by INSC, Assadian, and Khatemi. *Id.* 14-15. The jury checked "Yes" for all infringement questions in Parts I and II. It also awarded damages of $150,000 for infringement of the '298 patent and $50,000 for infringement of each of the '198 and '932 patents, for a total of $250,000. Finally, the jury found that all defendants infringed all three patents willfully. After trial, the district court found the case "exceptional" under 35 U.S.C. § 285 and awarded treble damages, attorneys' fees, interest, and costs to Wordtech. *Wordtech Sys., Inc. v. Integrated Network Solutions, Inc.*, No. 04-CV-1971 (E.D. Cal. Jan. 15, 2009) (memorandum and order). Defendants filed pre- and post-verdict motions for judgment as a matter of law ("JMOL") under Rule 50 of the Federal Rules of Civil Procedure, and a motion for new trial under Rule 59(a), all of which the district court denied. *Wordtech Sys., Inc. v. Integrated Network Solutions, Inc.*, No. 04-CV-1971 (E.D. Cal. May 26, 2009) ("*Order*").

Defendants do not appeal the verdicts of infringement against INSC, the verdicts of willfulness, or the court's exceptional case determinations. They challenge only the liability verdicts against Khatemi and Assadian, the $250,000 damages award, and the court's denial of their

motion to amend their answer. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

DISCUSSION

## I. Individual Liability for Infringement

Khatemi and Assadian appeal the district court's denial of their motions for JMOL and new trial, arguing that they cannot be individually liable for direct infringement, contributory infringement, or inducement.

We review denial of post-trial motions for JMOL and new trial under regional circuit law. *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1370 (Fed. Cir. 2009). The Ninth Circuit reviews "a jury's verdict for substantial evidence in ruling on a properly made motion under Rule 50(b)." *Equal Employment Opportunity Comm'n v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). "However, in ruling on a Rule 50(b) motion based on grounds not previously asserted in a Rule 50(a) motion, we are limited to reviewing the jury's verdict for plain error, and should reverse only if such plain error would result in a manifest miscarriage of justice." *Id.* (quotation and citation omitted). "Under Rule 50, a party must make a Rule 50(a) motion for judgment as a matter of law before a case is submitted to the jury." *Id.* Rule 50(a) requires that a pre-verdict JMOL motion "specify the judgment sought and the law and facts that entitle the movant to the judgment." *See Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1082-83 (9th Cir. 2009) (quoting Fed. R. Civ. P. 50(a)(2)).

The Ninth Circuit reviews a "ruling on a motion for a new trial under Rule 59(a) for an abuse of discretion." *Go Daddy*, 581 F.3d at 962. "The trial court may grant a new trial, even though the verdict is supported by substantial evidence, if 'the verdict is contrary to the clear weight of

the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice.'" *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999) (citation omitted). We may reverse the denial of a Rule 59(a) motion "where the District Court has made a mistake of law." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quotation omitted).

### A. Direct Infringement

According to Khatemi and Assadian, INSC's corporate veil shielded them from direct infringement liability under 35 U.S.C. § 271(a) because they acted as company employees, and INSC was a valid corporation during all periods of alleged infringement. They insist that the validity of "INSC's corporate status was not an issue at trial" and that Wordtech introduced insufficient evidence to justify piercing INSC's corporate veil. Defs.' Principal Br. 38-39. In their motions for JMOL and new trial, Defendants preserved these arguments by contending that they were not liable as INSC officers and did not personally participate in infringement. *See* Defs.' Mot. for JMOL Pre-Verdict 5-7 ("Rule 50(a) motion"); Defs' Memo. in Support of JMOL Post-Verdict 8-9, 16-17 ("Rule 50(b) motion"); Defs.' Memo. in Support of New Trial 4-7 ("Rule 59(a) motion").

"Patent infringement is a tort," *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1365 (Fed. Cir. 2008), and "[i]n general, a corporate officer is personally liable for his tortious acts, just as any individual may be liable for a civil wrong," *Hoover Group, Inc. v. Custom Metalcraft, Inc.*, 84 F.3d 1408, 1411 (Fed. Cir. 1996). However, the "corporate veil" shields a company's officers from personal liability for direct infringement that the officers commit in the name of the corporation, unless the corporation is the

officers' "alter ego." *See Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1295 (Fed. Cir. 2007). "To determine whether corporate officers are personally liable for the direct infringement of the corporation under § 271(a) requires invocation of those general principles relating to piercing the corporate veil." *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1579 (Fed. Cir. 1986).[2]

On appeal, Wordtech defends the verdict on two grounds. First, Wordtech claims that INSC was "non-existent" during the alleged infringement because, under Nevada law, INSC permanently forfeited its corporate charter when it neglected to file required annual statements for five consecutive years and cannot be "reinstated." *See* Nev. Rev. Stat. § 78.180(4) (2006); Wordtech's Br. 16. Defendants respond that they successfully "revived" INSC in 2006, with retroactive effect, by filing appropriate paperwork. *See* Nev. Rev. Stat. §

---

[2] Commentators have argued that the corporate veil should apply only to owners, not to officers. *See* Lynda J. Oswald, *The Personal Liability of Corporate Officers for Patent Infringement*, 44 IDEA 115, 130 (2003) ("Piercing is a mechanism for reaching the *owners* (i.e., shareholders) of a corporation, not the *officers*. It has no application in the context of officer liability."); *see also* Patrick T. Schmidt, Note, *The Internalization of Corporate Patent Infringement*, 88 Tex. L. Rev. 217, 233 (2009) ("[V]eil-piercing is a doctrine by which *shareholders* are held liable for obligations of the corporation and is generally thought to have nothing to do with non-owner liability."). Wordtech does not argue that Khatemi and Assadian are owners of INSC, nor does it attempt to make any distinction between officers and owners on the corporate veil issue. Moreover, until such a challenge is presented and reconsidered by the full court, "[p]anels of this court are bound by previous precedential decisions until overturned by the Supreme Court or by this court *en banc*." *Barclay v. United States*, 443 F.3d 1368, 1373 (Fed. Cir. 2006).

78.740 (2007); *Redl v. Sec'y*, 85 P.3d 797, 799-800 (Nev. 2004). Alternatively, Wordtech contends that even if INSC was a valid corporation, the jury heard substantial evidence that supported piercing INSC's corporate veil.

We do not evaluate these arguments because the jury instructions did not address any issue relating to corporate status. We have held that the doctrine of piercing the corporate veil involves "general principles," *Orthokinetics*, 806 F.2d at 1579, that do not apply only to patent cases, *Wechsler*, 486 F.3d at 1295 (noting that "the alter ego issue is not unique to patent law"). "More generally, a court may exert its equitable powers and disregard the corporate entity if it decides that piercing the veil will prevent fraud, illegality, injustice, a contravention of public policy, or prevent the corporation from shielding someone from criminal liability." *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 552 (Fed. Cir. 1990). Here, the district court never instructed the jury on INSC's corporate status. Neither the jury instructions nor the jury's verdict form mentioned piercing the corporate veil or the Nevada statutory scheme that Wordtech asserts on appeal. Jury Instructions; Joint Verdict Form. When Wordtech's counsel claimed that the instructions included corporate issues, the court replied: "That's not a jury instruction here." Reporter's Tr., Trial Proceedings, Nov. 10, 2008, 35:5-11.

Because the jury was not instructed about INSC's corporate status, we must determine whether this omission requires a new trial. For issues not unique to patent law, we review jury instructions under the law of the relevant regional circuit. *See Amgen Inc. v. F. Hoffmann-La Roche Ltd.*, 580 F.3d 1340, 1368 n.13 (Fed. Cir. 2009). In the Ninth Circuit, if a party does not object properly to jury instructions at trial, the instructions are reviewable only for plain error. *See Warfield v. Alaniz*, 569 F.3d

1015, 1029 (9th Cir. 2009); Fed. R. Civ. P. 51(d)(2) (2007) ("A court may consider a plain error in the instructions that has not been preserved as required by Rule 51(d)(1) if the error affects substantial rights."). The Advisory Committee Notes to the 2003 revision of Rule 51(d)(2), which explicitly authorized "plain error" review for jury instructions in the situation where no party objects, counsel that plain error depends on the "obviousness of the mistake," the "importance of the error," the "costs of correcting an error," and the "impact a verdict may have on nonparties." Notes of Advisory Committee on 2003 Amendments, Fed. R. Civ. P. 51(d)(2) (2003); *see also United States v. Treadwell*, 593 F.3d 990, 996 (9th Cir. 2010) (noting, in criminal context: "On plain error review, we correct an error not raised at trial only if it is plain, affects substantial rights, and 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'").

In this case, the jury's verdict of Khatemi and Assadian's individual liability, despite the lack of instructions on INSC's existence or piercing its corporate veil, was plain error that requires a new trial. Defendants concede that they did not object to the jury instructions. Nevertheless, failure to instruct the jury was plainly erroneous because "[p]ersonal liability under § 271(a) . . . requires sufficient evidence to justify piercing the corporate veil." *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1331 (Fed. Cir. 1999). Because resolution of INSC's corporate status was a legal prerequisite to finding Khatemi and Assadian individually liable, the jury omissions were obvious, important, and seriously affected the trial's fairness. Wordtech needed to prove either that INSC was not a valid corporation when Khatemi and Assadian committed infringing acts on its behalf, or that INSC's corporate veil should be disregarded under state

law.  We recognize that if "the error in the jury instruc-
tion is harmless, it does not warrant reversal."  *Dang v.
Cross*, 422 F.3d 800, 805 (9th Cir. 2005).  In this case,
however, we cannot deem the errors harmless.  While
Wordtech identified evidence that INSC did not exist or
served as Defendants' alter ego, a correctly instructed jury
could have concluded otherwise.

Moreover, the trial record shows that even though the
district court ruled that Wordtech waived its arguments
about INSC's corporate status, it nonetheless allowed
Wordtech to introduce evidence on these issues.  The
Final Pretrial Order did not mention any corporate issues.
Accordingly, when Wordtech's counsel tried to examine
Assadian about INSC's corporate filings, the court told
the parties: "Nobody has asked to add in the issue of the
corporate entity, corporate veil, anything else. . . .  That's
not an issue.  It was never brought up.  In the Complaint,
where did you say that they are not a valid corporation?"
Reporter's Tr., Trial Proceedings, Nov. 10, 2008, 33:2-9,
35:12-14.  On the trial's final day, Wordtech moved to
amend its complaint to address "the identity of the corpo-
ration," but the court denied the motion, noting that
"[a]nything with respect to issues of corporate ownership,
filing of corporate documents, could have been brought up
prior to the time of the Final Pretrial Order being issued .
. . ."  *Id.*, Nov. 12, 2008, 3:16-4:22.  However, in closing
arguments later that day, the court allowed the parties to
argue to the jury about whether Khatemi and Assadian
were INSC officers.  *Id.* 69:21-73:21, 86:12-87:17.  The
court then denied Defendants' post-trial motions on
individual liability because "Plaintiff produced evidence
tending to prove that INSC was not operating as a corpo-
ration during the time of infringement."  *Order* at 6.
However, because the jury instructions were plainly
erroneous, we conclude that the proceedings rested on "a

mistake of law" that warrants retrial. *Molski*, 481 F.3d at 729. We therefore reverse the district court's denial of Defendants' Rule 59(a) motion and remand for further proceedings on whether a new trial is warranted on Khatemi and Assadian's personal liability for direct infringement. Because Defendants have not clearly established that Wordtech waived its arguments about INSC's corporate status or failed to present substantial evidence on which a properly instructed jury could find Khatemi and Assadian personally liable, we affirm the denial of Defendants' motion for JMOL.

## B. Inducement

Defendants also challenge their individual liability for inducement. "Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). "[I]nducement requires that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc) (quotations and citations omitted).

Khatemi and Assadian claim that Wordtech produced insufficient evidence of inducement to support the verdict. However, Defendants did not raise inducement in their Rule 50(a) or Rule 50(b) motions. Therefore, they may not challenge the sufficiency of the evidence on this issue. *See Go Daddy*, 581 F.3d at 961-62. Defendants argued generally that INSC shielded them from personal liability. The corporate veil can shield officers from liability under § 271(a). *See Orthokinetics*, 806 F.2d at 1578-79. However, "corporate officers who actively assist with their corporation's infringement may be personally liable for inducing infringement *regardless* of whether the circumstances are such that a court should disregard the corporate entity and pierce the corporate veil." *Manville*, 917 F.2d at 553;

*see also Hoover*, 84 F.3d at 1412.[3]   Thus, Defendants' argument for JMOL was irrelevant to inducement.  As a result, we review only their motion for new trial on inducement, asking whether the verdict conflicts with the clear weight of the evidence or involved a mistake of law. *Molski*, 481 F.3d at 728-29.

We begin with the jury's verdict form.  In Part I, the jury was asked whether the Robocopier 8000 and 600 devices infringed by "(A) Inducing Infringement in the U.S."  Joint Verdict Form 2-14.  These verdict questions were nonsensical:  inducement requires intent, and as Wordtech's counsel acknowledged at the oral argument, "a device cannot induce infringement."  Oral Arg. 24:57-25:01,                    *available                    at* http://oralarguments.cafc.uscourts.gov/mp3/2009-1454.mp3.  The verdict form included no other inducement questions or instructions that might have mitigated these errors.

Moreover, the legal test for inducement was never presented to the jury.  As Wordtech's counsel confirmed, inducement was not raised in the Final Pretrial Order, in the jury instructions, or in the closing arguments. *See id.* 27:41-29:34.  Wordtech argues that the instructions did

---

[3]   In *Power Lift, Inc. v. Lang Tools, Inc.*, we explained that the history of the 1952 Patent Act supported "a 'broad' reading of § 271(b) which, in our view, may include liability of corporate officials who actively aid and abet their corporation's infringement."  774 F.2d 478, 481 (Fed. Cir. 1985).  We noted that regional circuits previously held officers liable for inducement without piercing the corporate veil. *E.g.*, *Int'l Mfg. Co. v. Landon, Inc.*, 336 F.2d 723, 729 (9th Cir. 1964).  The differing rules for officer liability under §§ 271(a) and 271(b) and the treatment of officer liability as distinguished from owner liability in our precedent are important issues that cannot be resolved on this record and are left for another day.

not mislead the jury because the jury received proper instructions on willful infringement, and in fact found willfulness. Wordtech's Br. 56-57. However, the legal standards for willfulness and inducement, such as the requisite intent, are not identical. *Cf. Broadcom Corp. v. Qualcomm, Inc.*, 543 F.3d 683, 699 (Fed. Cir. 2008). Therefore, these mistakes of law precluded legitimate verdicts on inducement.

## C. Contributory Infringement

Khatemi and Assadian also challenge their individual liability for contributory infringement. Under 35 U.S.C. § 271(c), a party who sells a component with knowledge that the component is especially designed for use in a patented invention, and is not a staple article of commerce suitable for substantial noninfringing use, is liable as a contributory infringer. *See Ricoh Co. v. Quanta Computer Inc.*, 550 F.3d 1325, 1337 (Fed. Cir. 2008).

Wordtech argues that Khatemi and Assadian waived any challenge to the sufficiency of the evidence for contributory infringement by failing to raise it in their pre-verdict Rule 50(a) motion. The district court denied Defendants' post-verdict Rule 50(b) motion on the grounds that "Defendants failed to raise any contributory infringement theory in a pre-verdict Motion." *Order* at 6. We agree. Defendants did not refer to contributory infringement in their Rule 50(a) motion, contesting only their individual liability as INSC employees. The district court thus correctly denied Khatemi and Assadian's motion for JMOL on contributory infringement. As with inducement, a corporation does not shield officers from liability for personally participating in contributory infringement. *See Hoover*, 84 F.3d at 1411 ("When personal wrongdoing is not supported by legitimate corporate activity, the courts have assigned personal liability for

wrongful actions even when taken on behalf of the corporation."); *Reynolds v. Bement*, 36 Cal. 4th 1075, 1089-90 (2005) (recognizing that "corporate directors . . . 'may be joined as defendants if they personally directed or participated in the tortious conduct.'"). We therefore affirm the denial of Defendants' motion for JMOL and review only their motion for new trial.

The district court's legal error in presenting the contributory infringement issue to the jury requires a new trial. While the jury received no instruction on inducement, it did receive an instruction on contributory infringement, which Defendants did not oppose. Jury Instructions No. 21. However, the verdict form asked the jury the confusing question of whether the Robocopier *devices* infringed by "(B) Contributing to infringement in the U.S.," even though devices cannot possess knowledge required under § 271(c). Joint Verdict Form 2-14.

A new trial is also required because Wordtech fails to identify proof of elements required for contributory infringement. Wordtech points to no evidence that Assadian (who testified that he was an engineer) personally participated in any sales of Robocopiers or nonstaple components. The record also fails to show that any parts that Defendants may have sold were especially designed for infringing products. Wordtech cites INSC invoices that show customer orders for abbreviated items such as "RC-8800 16X BARE," "RIBBON RIMAGE BLACK," and "Labor." However, Wordtech identifies no evidence that these items are "a material part of the invention," or "especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use." § 271(c). Moreover, the jury did not find any direct infringement corresponding to Khatemi and Assadian's alleged contributory infringement. "A defen-

dant's liability for indirect infringement must relate to the identified instances of direct infringement." *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1274 (Fed. Cir. 2004). Although "[c]ircumstantial evidence can support a finding of infringement," *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1362 (Fed. Cir. 2006), when asked at oral argument, Wordtech's counsel could not identify any findings of direct infringement by INSC customers. *See* Oral Arg. 25:48-26:54. While the jury found that INSC infringed, § 271(c) requires a sale or offer to sell by the accused contributory infringer to a direct infringer. Here, no evidence shows that Khatemi or Assadian sold or offered to sell nonstaple components to INSC.

Overall, multiple errors in the jury charge and the verdict form, across all infringement theories, compel the conclusion that, "looking to the instructions as a whole, the substance of the applicable law was [not] fairly and correctly covered." *Dang*, 422 F.3d at 805 (citation omitted).

\* \* \*

For the foregoing reasons, we vacate the liability verdicts against Khatemi and Assadian, reverse the denial of their Rule 59(a) motion on these issues, and remand for consideration of whether a new trial is warranted on their individual liability for direct infringement, inducement, and contributory infringement. On remand, the district court should address the issues of piercing INSC's corporate veil and INSC's corporate status, whether Wordtech preserved these arguments for trial, the law governing

these issues,[4] and whatever jury instructions might be necessary.

## II. Damages

### A. Arguments on Appeal

Khatemi, Assadian, and INSC challenge the jury's $250,000 damages award. As a threshold matter, we first determine what arguments Defendants preserved. On appeal, they assert two theories: (1) Wordtech's evidence was "insufficient to support a finding of any 'hypothetical royalty'" or to establish "the amount of INSC's sales revenues," and (2) the damages award was "excessive." Defs.' Principal Br. 25, 33, 34. Defendants' first argument suggests that the record supports *no* possible damages and requests a new trial. Their second argument challenges the reasonableness of the award, without disputing that *some* damages were warranted, and requests either a new trial or a remittitur of $52,250.

Defendants raised their second theory before the district court, but not their first. In their Rule 50(a), 50(b), and 59(a) motions, they did not argue that the evidence was insufficient as a matter of law to support any damages at all. Therefore, this argument is waived on appeal. *See In re Am. W. Airlines, Inc.*, 217 F.3d 1161, 1165 (9th Cir. 2000) ("Absent exceptional circumstances, we generally will not consider arguments raised for the first time on appeal, although we have discretion to do so."). Defendants raised their second theory in their post-verdict Rule 50(b) and 59(a) motions, arguing that the jury assessed "punitive/exemplary" damages compared to Defendants'

---

[4]    In federal question cases with exclusive jurisdiction in federal court, such as bankruptcy, the court should apply federal, not forum state, choice of law rules." *In re Lindsay*, 59 F.3d 942, 948 (9th Cir. 1995).

calculation of $17,114.  Wordtech did not object to this argument at the trial court (or before us) on the grounds that Defendants failed to present it in their pre-verdict Rule 50(a) motion.  *See* Pl.'s Opp'n to Defs.' Mot. for JMOL.  However, the district court denied Defendants' Rule 50(b) motion for this reason, and denied their Rule 59(a) motion because the verdict was "supported by the evidence at trial."  *Order* at 4, 12.  Defendants did not request remittitur of $52,250 in their motion for new trial.

On appeal, Defendants do not dispute the denial of their Rule 50(b) motion for waiver.  In the Ninth Circuit, failure to challenge the sufficiency of the evidence for damages in a Rule 50(a) motion waives the right to raise it in a Rule 50(b) motion.  *See Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1041-42 (9th Cir. 2003).[5] Therefore, we review Defendants' challenge to excessiveness of damages only in the context of their Rule 59(a) motion.

## B. Reasonable Royalty

When reviewing damages in patent cases, we apply regional circuit law to procedural issues and Federal Circuit law to substantive and procedural issues "pertaining to patent law."  *Aero Prods. Int'l, Inc. v. Intex Recreation Corp.*, 466 F.3d 1000, 1016 (Fed. Cir. 2006); *see also Fiskars, Inc. v. Hunt Mfg. Co.*, 279 F.3d 1378, 1381 (Fed. Cir. 2002) (noting that Federal Circuit law controls "the distinctive characteristics of patent damages law").  Under Ninth Circuit law governing motions for new trial, "[w]e must uphold the jury's finding unless the amount is

---

[5]    *Cf. Go Med. Indus. Pty, Ltd. v. Inmed Corp.*, 471 F.3d 1264, 1272 (Fed. Cir. 2006) ("It would have been impossible, however, for MMG and Rüsch to challenge the jury's award of damages as excessive in a Rule 50(a) motion.").

grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996) (citations omitted).

A patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty." 35 U.S.C. § 284. A reasonable royalty can be calculated from an established royalty, the infringer's profit projections for infringing sales, or a hypothetical negotiation between the patentee and infringer based on the factors in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). *Lucent Techs. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009); *Minks v. Polaris Indus.*, 546 F.3d 1364, 1372 (Fed. Cir. 2008). The hypothetical negotiation "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began," and "necessarily involves an element of approximation and uncertainty." *Lucent*, 580 F.3d at 1324-25 (citation omitted).

At trial, Wordtech sought only a hypothetically negotiated royalty, and the jury received damages instructions for this theory alone. Jury Instructions No. 22, 23. Wordtech claimed that INSC sold $950,000 of infringing Robocopiers and asked for "at least 12 percent of the [$]950,000 or [$]114,000." Reporter's Tr., Trial Proceedings, Nov. 12, 2008, 48:6-9. However, the $250,000 verdict equates to a 26.3% royalty on the $950,000 total alleged sales. Wordtech offered no expert opinion on damages, but relied on testimony from its President, David Miller. Through Miller, Wordtech introduced thirteen patent licenses that it previously granted to third parties for rights to some or all of the patents-in-suit, along with roughly forty INSC invoices for Robocopier sales.

Defendants argue that Wordtech's thirteen licenses cannot support the verdict because they reflect different economic circumstances. In this case, the licenses relate to *Georgia-Pacific* factor 1: "The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty." 318 F. Supp. at 1120. We recently discussed the evidentiary value of past licensing agreements for estimating royalties under *Georgia-Pacific*. In *Lucent*, we held that a set of eight licenses lacked sufficient relevance to the proven infringement to support a lump-sum royalty verdict. 580 F.3d at 1332. Those licenses reflected rates that the infringer paid to license comparable but different patents under *Georgia-Pacific* factor 2, not the rates that the patentee received for the patents-in-suit. *Id.* at 1325. However, *Lucent* is relevant because it explained general criteria for comparing patent licenses—specifically, the differences between lump-sum royalties (where the patentee receives a single upfront payment) and running royalties (where the patentee collects ongoing per-unit or percentage payments). We concluded that four of the eight licenses, though lump-sum agreements, were not "sufficiently comparable" because they arose from divergent circumstances and covered different material. *Id.* at 1328-29. We rejected the remaining four licenses, which contained running royalties, because the patentee provided no basis for comparing those running royalties to the jury's lump-sum award. *Id.* at 1329-30. Similarly, in *ResQNet.com, Inc. v. Lansa, Inc.* (decided after argument in this case), we overturned a running royalty verdict based on seven licenses, "five of which had no relation to the claimed invention," and the other two of which arose from litigation. 594 F.3d 860, 870 (Fed. Cir. 2010). We stressed that comparisons of past patent licenses to the infringement must account for "the technological and economic differences" between them. *Id.* at 873.

In this case, Wordtech's licenses suffer from similar flaws. The jury awarded the $250,000 as a lump-sum royalty. The verdict form asked the jury: "If the above amount was based upon a running royalty rather than a lump sum, what percentage or per unit rate did you use? __." Joint Verdict Form 15. The jury left this item blank, indicating a lump sum. *E.g.*, *Lucent*, 580 F.3d at 1325 (finding that "the jury decided on a lump-sum award, not a running royalty" because "[t]he verdict form notes a lump-sum damages amount and no amount (i.e., zero or 'N/A') on the lines for a running royalty."). We explained in *Lucent* that lump-sum licenses are generally more useful than running-royalty licenses for proving a hypothetical lump sum because "certain fundamental differences exist between lump-sum agreements and running-royalty agreements." *Id.* at 1330.

Of Wordtech's thirteen licenses, only two were lump-sum agreements. The first such licensee paid Wordtech $175,000 for nonexclusive rights to the '298 and '198 patents and any related or Wordtech-owned patents. The second licensee paid $350,000 for nonexclusive rights to the '298, '198, and '932 patents on similar terms. Wordtech claims the verdict was reasonable because $250,000 is roughly the average of these two lump-sum fees, or $262,500—even though Wordtech asked for only $114,000, or less than half the verdict. This "averaging" theory is flawed because the two lump-sum licenses provide no basis for comparison with INSC's infringing sales. Neither license describes how the parties calculated each lump sum, the licensees' intended products, or how many products each licensee expected to produce. Indeed, when asked if the record supplied "any idea of the volume of sales or projected sales," Wordtech's counsel admitted: "With the trial court, none of that was discussed." Oral Arg. 19:19-54. Wordtech identified forty

Robocopier 600 and sixteen Robocopier 8000 models that INSC sold. Wordtech's Br. 32. If Wordtech's previous licensee paid $350,000 to produce one thousand devices, for example, INSC would not have agreed ex ante to pay $250,000 if it expected to make only fifty-six units. Thus, without additional data, the licenses offered the jury "little more than a recitation of royalty numbers." *Lucent*, 580 F.3d at 1329.

The remaining eleven licenses, which used running royalties, also fail to support the verdict. Running-royalty agreements can be relevant to lump-sum damages, but "some basis for comparison must exist in the evidence presented to the jury." *Id.* at 1330. The remaining licenses reveal no such basis. One license listed per-unit fees of $100-195 instead of a royalty percentage. By contrast, the verdict reflects a per-unit fee that exceeds $4400 ($250,000 for fifty-six units). The other ten licenses stated royalty rates in the range of 3-6% of the licensees' sales—far less than the 26.3% rate that the jury effectively awarded. Wordtech claims that these rates actually ranged as high as 10%, but this argument distorts the record. The only rates above 6% would result from penalties for accounting lapses. A Wordtech license to An Chen Computer Company, for example, employed a 5% base rate that increased to 12% only if An Chen underreported its sales in more than two audits. More importantly, even a past royalty range of 3-12% fails to explain a 26.3% hypothetically negotiated rate. Wordtech signed several of these licenses after initiating or threatening litigation against the licensees, and "litigation itself can skew the results of the hypothetical negotiation." *ResQNet*, 594 F.3d at 872 (citing *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078-79 (Fed. Cir. 1983)).

Even if Wordtech's licenses supported a high royalty percentage under *Georgia-Pacific* factor 1, Wordtech's use

of INSC's invoices raises doubts about the sales volume to which the jury could have applied the royalty rate. Wordtech told the jury that INSC sold $950,000 of Robocopiers, but now argues on appeal that INSC's sales totaled "*at least* $1,278,133" based on "reasonable inferences." Wordtech's Br. 35. Wordtech supplies no evidence that explains why its sales estimate abruptly increased by $328,133. Wordtech's original $950,000 figure is itself suspect because Miller, who did not qualify as a damages expert, calculated it by using "the second highest value" from INSC's invoices "as a *phantom value.*" Reporter's Tr., Trial Proceedings, Nov. 10, 2008, 39:21-40:6 (emphasis added). The invoice dates also suggest that the jury incorrectly apportioned damages among the three patents. The jury was instructed to award damages for the '932 patent only for infringement after the patent issued on November 23, 2004. Jury Instructions No. 24, 25(c). Wordtech introduced only two INSC invoices that postdate the '932 patent's issue date, totaling $6620. However, the jury awarded $50,000 for the '932 patent. Wordtech implies that INSC withheld records of Robocopier 8000 sales, permitting the jury to infer greater sales. Wordtech's Br. 14, 32; *see Beatrice Foods Co. v. New Eng. Printing & Lithographing Co.*, 899 F.2d 1171, 1175 (Fed. Cir. 1990) ("An infringer can not destroy the evidence of the extent of its wrongdoing, and limit its liability to that which it failed to destroy."). Yet the district court did not find that Defendants withheld or destroyed any documents. Moreover, the jury needed to infer almost $417,000 of post-issuance sales to award $50,000 in royalties at Wordtech's proposed 12% royalty rate. Therefore, it was impossible for the verdict to fall "within the range encompassed by the record as a whole." *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 519 (Fed. Cir. 1995).

Apart from licenses and invoices, Wordtech insists that the verdict is supported by *Georgia-Pacific* factor 13: the portion of the infringer's profit that "should be credited to the invention as distinguished from non-patented elements." 318 F. Supp. at 1120. Wordtech claims that INSC purchased Robocopier hardware at low prices, added only software, and resold the machines at much higher prices. According to Wordtech, claims 13 and 14 of the '298 patent cover INSC's software; therefore, INSC's entire profit corresponded to the inventions. Defendants respond that the '298 patent claims do not cover Robocopier software and that Wordtech's profit projections are baseless. Even if Wordtech is correct that its patents account for the entire value of the Robocopiers, its profit arguments rest on speculation. For example, Wordtech claims that INSC purchased the Robocopier 600 hardware for $2000 per unit and sold the finished machine for $14,000, reaping a $12,000 profit. Wordtech's Br. 31. This assumes, however, that INSC incurred zero costs. Using these unproven profit numbers, Wordtech then posits that "a reasonable 50% royalty on the infringer's profit of $800,000 would net $400,000. A reasonable 30% royalty on the gross profit would net $240,000." *Id.* 32. Again, Plaintiff did not pose this theory to the jury, nor explain why 50% or 30% would be "reasonable." Wordtech also postulates that "it is likely that Miller would be more interested in a share of the expected profit than a percentage royalty," and that "[c]ommon sense would dictate that Miller would ask for half of the profit or a lump sum fee." *Id.* 33-34. Instead of providing plausible explanations for the verdict, these unsupported rationalizations highlight the speculative nature of the evidence.

Wordtech's remaining *Georgia-Pacific* arguments continue this pattern of guesswork. Wordtech argues that numerous infringers existed when the '298 patent issued,

and therefore "the jury could well infer that signing up licensees and bagging cats were equally difficult." *Id.* 27-28. But it provides no grounds for estimating how this licensing environment (if accurate) would influence INSC's royalty payments. Wordtech also cites prior decisions where we affirmed certain royalty percentages. *E.g.*, *Mitutoyo Corp. v. Cent. Purchasing, LLC*, 499 F.3d 1284, 1292 (Fed. Cir. 2007) (29.2% royalty). Yet Wordtech never tethers the facts of those cases to the circumstances here. Furthermore, the district court's order sheds no light on Wordtech's arguments because it provided no damages analysis—only the conclusory statement that the verdict was "supported by the evidence at trial." *Order* at 12.

Because the verdict was "clearly not supported by the evidence" and "based only on speculation or guesswork," *Del Monte*, 95 F.3d at 1435, we reverse the denial of Defendants' Rule 59(a) motion and remand for a new trial on damages. We deny Defendants' request for remittitur as untimely. In their Rule 59(a) motion, Defendants suggested $17,114 as a proper award, but did not request remittitur or propose the alternative $52,250 calculation that they seek for the first time on appeal. We therefore decline to calculate in the first instance "the maximum amount sustainable by the proof" for remittitur. *D&S Redi-Mix v. Sierra Redi-Mix & Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir. 1982).

### III. Motion to Amend

Defendants claim that the district court erred by denying their motion to amend their answer to allege invalidity affirmative defenses. We disagree.

In the Ninth Circuit, denial of a motion for leave to amend a pleading is reviewed for abuse of discretion. *See Lockheed Martin Corp. v. Network Solutions, Inc.*, 194

F.3d 980, 983 (9th Cir. 1999).  Leave to amend pleadings after the trial court enters a final scheduling order requires good cause, which "primarily considers the diligence of the party seeking the amendment."  *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000) (citation omitted).

On September 13, 2006, the district court issued its Rule 16(b) scheduling order, which closed discovery on November 7, 2006 and prohibited amendments to pleadings absent good cause.  Defendants filed their motion on February 13, 2007—five months after the scheduling order, three months after the close of discovery, and almost three weeks after it first learned that the School District intended to settle.  They offer no explanation for their tardiness, arguing instead that the School District's pleading gave Wordtech notice of possible defenses.  However, the School District's answer provided little notice because it stated simply: "On information and belief, the claims of the Patents are invalid for failure to comply with the requirements of 35 U.S.C. §§ 102, 103, and/or 112."  San Juan Unified Sch. Dist.'s Answer to First Am. Compl. 10.  Wordtech protests that it would suffer prejudice from additional discovery for these defenses, and the Ninth Circuit recognizes that "[a] need to reopen discovery and therefore delay the proceedings supports a district court's finding of prejudice from a delayed motion to amend the complaint."  *Lockheed*, 194 F.3d at 986.  The district court also noted that INSC retained an expert and secured an invalidity report as early as November 10, 2004, and therefore should have known its relevant defenses long before the Rule 16(b) order.  This delay resembles the situation in *Coleman*, where the movants hired experts and obtained a report "over a year before filing for summary judgment," and were therefore denied leave to amend their complaints.

232 F.3d at 1295. Considering all these factors, we conclude that the trial court did not abuse its discretion.

CONCLUSION

For the foregoing reasons, we reverse the denial of Defendants' motion for new trial on Khatemi and Assadian's individual liability for direct infringement, inducement, and contributory infringement. We also reverse the denial of Defendants' motion for new trial on damages. However, we affirm the denial of Defendants' motions for JMOL and for leave to amend, and remand for further proceedings.

**REVERSED-IN-PART, AFFIRMED-IN-PART, and REMANDED**