# United States Court of Appeals for the Federal Circuit

---

**FINJAN, INC. (FORMERLY FINJAN SOFTWARE, LTD.),**

*Plaintiff-Cross Appellant,*

v.

**SECURE COMPUTING CORPORATION, CYBERGUARD CORPORATION, AND WEBWASHER AG,**

*Defendants-Appellants,*

AND

**DOES 1 THROUGH 100,**

*Defendants.*

---

2009-1576, -1594

---

Appeals from the United States District Court for the District of Delaware in Case No. 06-CV-0369, Chief Judge Gregory M. Sleet.

---

Decided: November 4, 2010

---

DARYL L. JOSEFFER, King & Spalding LLP, of Washington, DC, argued for plaintiff-cross appellant. With him on the brief were PAUL D. CLEMENT; PAUL J. ANDRE, LISA

KOBIALKA of Redwood Shores, California; and ADAM CONRAD, of Charlotte, North Carolina.

DAVID J. HEALEY, Fish & Richardson P.C. of Houston, Texas, argued for defendants-appellants. With him on the brief was JUSTIN M. BARNES, of San Diego, California. Of counsel on the brief were RONALD J. SCHUTZ, JACOB M. HOLDREITH, CHRISTOPHER A. SEIDL, and TREVOR J. FOSTER, Robins, Kaplan, Miller & Ciresi LLP, of Minneapolis, Minnesota. Of counsel was BENJAMIN C. ELACQUA.

---

Before NEWMAN, GAJARSA, and LINN, *Circuit Judges*.

LINN, *Circuit Judge*.

This is a patent infringement case involving "proactive scanning" technology for computer security. Finjan, Inc. sued Secure Computing Corporation ("Secure"), Cyberguard Corporation, and Webwasher AG (collectively "Defendants") in the District Court for the District of Delaware for infringement of U.S. Patents No. 6,092,194 ("'194 patent"), No. 6,804,780 ("'780 patent"), and No. 7,058,822 ("'822 patent"). Defendants counterclaimed against Finjan for infringement of U.S. Patents No. 6,357,010 ("'010 patent") and No. 7,185,361 ("'361 patent"). A jury found that none of the patents was invalid, that Finjan did not infringe Defendants' patents, and that Defendants willfully infringed all asserted claims of Finjan's patents. The district court awarded damages to Finjan, enhanced the award under 35 U.S.C. § 284, and imposed a permanent injunction against Defendants.

Defendants appeal infringement and damages. Finjan cross-appeals denial of damages for the period between the entry of judgment and the entry of the injunction. We affirm the verdict of infringement on the

asserted "system" and "storage medium" claims, but reverse the verdict of infringement on the asserted method claims. We also affirm the damages award, but remand for determination of post-judgment, pre-injunction damages.

## BACKGROUND

Finjan's asserted patents relate to proactive scanning, or techniques directed to detecting and defeating previously unknown, Internet-based threats to computers, such as viruses.

The '194 patent is entitled a "System and Method for Protecting a Computer and a Network From Hostile Downloadables." Claim 1 is representative:

> 1. A computer-based method, comprising the steps of:
>
>   receiving an incoming Downloadable addressed to a client, by a server that serves as a gateway to the client;
>
>   comparing, by the server, Downloadable security profile data pertaining to the Downloadable, the Downloadable security profile data includes a list a [sic] suspicious computer operations that may be attempted by the Downloadable, against a security policy to determine if the security policy has been violated; and
>
>   preventing execution of the Downloadable by the client if the security policy has been violated.

The asserted claims include method claims (1-14, 24-30) and corresponding "system" (32-36) and "computer-readable storage medium" (65) claims for performing the claimed methods.

The '780 patent bears the same title as the '194 patent and covers "caching," or identifying previously encountered downloadable files. Representative claim 1 describes:

> 1. A computer-based method for generating a Downloadable ID to identify a Downloadable, comprising:
>
> obtaining a Downloadable that includes one or more references to software components required to be executed by the Downloadable;
>
> fetching at least one software component identified by the one or more references; and
>
> performing a hashing function on the Downloadable and the fetched software components to generate a Downloadable ID.

Like the '194 patent, the asserted claims of the '780 patent include method claims (1-6), system claims (9-14), and a computer-readable storage medium claim (18).

The '822 patent is directed to a "Malicious Mobile Code Runtime Monitoring System and Methods" and addresses "sandboxing" potentially dangerous downloadables with protective code. Representative claim 4 covers:

> 4. A processor-based method, comprising:
>
> receiving downloadable-information;
>
> determining whether the downloadable-information includes executable code; and
>
> causing mobile protection code to be communicated to at least one information-destination of the downloadable-information, if the downloadable-

> information is determined to include executable code,
>
> wherein the causing mobile protection code to be communicated comprises forming a sandboxed package including the mobile protection code and the downloadable-information, and causing the sandboxed package to be communicated to the at least one information-destination.

The relevant claims encompass "processor-based methods" (4, 6, 8) and "processor-based systems" (12-13). Thus, the asserted claims of each patent in suit include both method and non-method claims.

Defendants sold three accused computer security products: a "Webwasher" software download, a "Webwasher" hardware "appliance" or server containing software, and a "Cyberguard TSP" hardware appliance that also contains software. Defs.' Principal Br. 11. It is undisputed that all three products contain source code for eight software modules. Three of those modules—Anti-Virus, Anti-Malware, and Content Protection—offer proactive scanning functionality, in addition to other features. The eight modules are "locked" when the three products are sold, requiring a customer to purchase a separate key to activate each individual module. Therefore, a customer who purchases an accused product can activate all, some, or none of the eight modules at different cost. *See* Tr. of Jury Trial (Day Four), Mar. 6, 2008, 704:6-20.[1]

Finjan alleged that Defendants directly infringed under 35 U.S.C. § 271(a) by testing and selling the accused

---

[1]    For convenience, we refer to the combined trial transcripts as "Transcript."

products. Finjan did not assert any theories of indirect infringement. The jury found that Defendants willfully infringed all asserted claims, either literally or under the doctrine of equivalents. Joint Special Verdict Form 2-6. It also found that Finjan did not infringe any asserted claims of the '010 and '361 patents, and that none of the five patents in suit was invalid. The jury awarded Finjan $9.18 million in royalties. *Id.* at 10. The parties filed various motions for judgment as a matter of law ("JMOL") or a new trial under Rules 50 and 59(a) of the Federal Rules of Civil Procedure. The district court denied those motions, but enhanced damages by 50%, awarded damages that accrued between the verdict and entry of judgment, and entered a permanent injunction. *Finjan Software, Ltd. v. Secure Computing Corp.*, No. 06-CV-369 (D. Del. Aug. 18, 2009) ("*Memorandum*").

Defendants appeal the verdicts of infringement of Finjan's patents and damages, but do not appeal the jury's determinations regarding noninfringement of Defendants' patents, validity of all patents, or willfulness with respect to infringement of Finjan's patents. Finjan cross-appeals only the district court's damages ruling, claiming additional entitlement to post-judgment, pre-injunction damages. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

DISCUSSION

I. Infringement

"A determination of infringement is a question of fact that is reviewed for substantial evidence when tried to a jury." *ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1311 (Fed. Cir. 2007). We review denial of post-trial motions for JMOL and new trial under regional circuit law. *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1370 (Fed. Cir. 2009).

In the Third Circuit, review of denial of JMOL is plenary. *McKenna v. City of Phila.*, 582 F.3d 447, 460 (3d Cir. 2009). "[W]e must review the record in the light most favorable to the prevailing party unless the record is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief." *Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 370 (3d Cir. 2004) (quotation omitted). "The standard of review on a motion for a new trial is abuse of discretion, except where a district court bases its denial of the motion on an application of law, in which case an appellate court's review is plenary." *McKenna*, 582 F.3d at 460. The Third Circuit views the evidence in the light most favorable to the nonmoving party. *Grazier v. City of Phila.*, 328 F.3d 120, 128 (3d Cir. 2003). "[N]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991).

## A. System and Storage Medium Claims

In a nutshell, Defendants' noninfringement theory is that they sold no infringing products because all software modules that feature proactive scanning were locked when sold. "For the customer," according to Defendants, "as a practical matter, it was the same as if it never received the source code for the 'locked down' modules and their features at all." Defs.' Principal Br. 5. Defendants argue that infringement occurred only when customers purchased keys and unlocked proactive scanning modules because "[d]isabled code, by definition, is incapable of being used." *Id.* 28. Thus, Defendants claim that Finjan's failure to allege indirect or joint infringement is fatal.

Finjan responds first with a waiver argument, claiming that Defendants forfeited their contention that locked software cannot infringe by failing to raise it in their JMOL motions. This court disagrees. It is correct that "[i]f a party seeks a judgment in its favor based on insufficiency of the evidence, he must file for judgment as a matter of law both before the case is submitted to the jury and after a verdict is returned." *Pediatrix Screening, Inc. v. TeleChem Int'l, Inc.*, 602 F.3d 541, 546 (3d Cir. 2010). But here, Defendants orally moved for JMOL of noninfringement under Rule 50(a) at the close of Finjan's case. While the district court denied the motion, Transcript at 687:1-688:8, challenging infringement orally was sufficient, *see* Fed. R. Civ. P. 7(b)(1)(A). Defendants also filed a written Rule 50(a) motion on the last day of trial, repeating its noninfringement position. *See* Defs.-Counterclaimants' Mot. for JMOL Pursuant to Fed. R. Civ. P. 50. The district court considered these issues preserved and reserved judgment until the parties renewed their JMOL motions after trial under Rule 50(b). *Memorandum* at 2 & n.1; Transcript at 673:12-21. In that renewed motion, Defendants reiterated their noninfringement argument and fully explained their locked software theory. *See* Defs.-Counterclaimants' Mot. for JMOL and New Trial. Importantly, Finjan did not oppose Defendants' Rule 50(b) motion on waiver grounds, thereby itself waiving this objection. *See Williams v. Runyon*, 130 F.3d 568, 572 (3d Cir. 1997) (adopting rule that "where a party did not object to a movant's Rule 50(b) motion specifically on the grounds that the issue was waived by an inadequate Rule 50(a) motion, the party's right to object on that basis is itself waived"). Moreover, even if Defendants' Rule 50(a) motions were inadequate, they may still seek review of the verdict under Rule 59. *See Pediatrix*, 602 F.3d at 546 (noting that "the text of Rule 59

does not require any pre-verdict motions"). For these reasons, Finjan's waiver argument fails.

While the argument is not waived, we disagree with the merits of Defendants' theory. Defendants claim that our court has held that "locked" or disabled products cannot infringe apparatus claims. Their reliance on our precedent is misplaced.

In *Southwest Software, Inc. v. Harlequin Inc.*, this court affirmed denial of a new trial on infringement, after a verdict of noninfringement, because the evidence showed that the accused software product "included a manual step which avoided the automatic selection feature of the patented invention even though the code for automatic selection remained in place." 226 F.3d 1280, 1291 (Fed. Cir. 2000). Defendants interpret *Southwest* to hold that locked code cannot infringe. However, the claim at issue in that case was a method that required performance of each claimed step. *Id.* at 1285. Here, the claims at issue are "system" and "storage medium" claims, which do not require the performance of any method steps. *See NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1318 (Fed. Cir. 2005) ("[T]he use of a process necessarily involves doing or performing each of the steps recited. This is unlike use of a system as a whole . . . .").

Defendants also rely on *ACCO Brands*, where we overturned a jury verdict of inducement because the patentee failed to "either point to specific instances of direct infringement or show that the accused device necessarily infringes the patent in suit." 501 F.3d at 1313. The asserted apparatus claims covered locking devices with pins in a specific configuration. The accused device could "be operated in either of two modes," one infringing and one not. *Id.* We explained that, in the absence of any evidence that customers actually operated

the device in the infringing mode, direct infringement could not be inferred. Defendants insist that under *ACCO Brands*, an accused device does not infringe if it "can be used at any given time in a noninfringing manner." Defs.' Principal Br. 33 (citing 501 F.3d at 1313). However, in *ACCO Brands*, the claim language required the locking device's pin to extend through a slot in a specific configuration. 501 F.3d at 1310. Here, by contrast, Finjan's apparatus claims do not require that the proactive scanning software be configured in a particular way to infringe—only that it be programmed for performing the claimed steps. For example, claim 32 of the '194 patent covers "[a] system for execution by a server that serves as a gateway to a client, the system comprising: a security policy; an interface . . . ; a comparator . . . ; and a logical engine . . . ."

Defendants insist that the asserted claims require actual operability. The asserted "system" claims include "engines," such as a "logical engine" ('194 patent claim 32), a "communications engine" ('780 patent claim 9), and a "linking engine" ('822 patent claim 12). Defendants cite the testimony of Finjan's expert Dr. Giovanni Vigna, who stated at trial that an engine "has an active task to perform," and is an "active component." Transcript at 410:6-7, 22. Seizing upon the word "active," Defendants argue that the source code must be "enabled" to infringe. However, neither the claim language nor Vigna's testimony supports this contention.

As we have cautioned, "in every infringement analysis, the language of the claims, as well as the nature of the accused product, dictates whether an infringement has occurred." *Fantasy Sports Props. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1118 (Fed. Cir. 2002). Accordingly, we have held that, to infringe a claim that recites capability and not actual operation, an accused device "need only

be capable of operating" in the described mode. *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed. Cir. 1991). Thus, depending on the claims, "an accused device may be found to infringe if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of noninfringing modes of operation." *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1343 (Fed. Cir. 2001); *see also Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*, 555 F.3d 984, 994 (Fed. Cir. 2009) (noting that the "reasonably capable" test applies "only to claim language that specifies that the claim is drawn to capability").

In this case, Finjan's non-method claims describe capabilities without requiring that any software components be "active" or "enabled." The system claims recite software components with specific purposes: "a logical engine *for preventing* execution" ('194 patent claim 32), "a communications engine *for obtaining* a Downloadable" ('780 patent claim 9), or "a linking engine . . . *for forming* a sandbox package" ('822 patent claim 12) (emphases added). The storage medium claims similarly cover capability. Claim 65 of the '194 patent recites a "computer-readable storage medium storing program code for causing a server that serves as a gateway to a client to perform the steps of: receiving . . . ; comparing . . . ; and preventing execution . . . ." This language does not require that the program code be "active," only that it be written "for causing" a server ('194 patent claim 65) or a computer ('780 patent claim 18) to perform certain steps. Vigna's infringement analysis did not contradict this language. He defined an "engine" as "some kind of component whose task is to operate some kind of analysis or transformation." Transcript at 410:4-5. Thus, Vigna explained that an engine is a portion of code designed to perform an indicated operation, but is not necessarily

unlocked or active. Defendants admit that program code for proactive scanning is "literally present" on all accused products. Oral Arg. at 1:53-58, *available at* http://oralarguments.cafc.uscourts.gov/mp3/2009-1576.mp3. Secure's Senior Vice President Michael Gallagher testified that even if a software module was turned off, "[t]he module is resident in the binary source code that is in the product." Transcript at 722:19-22. Thus, it is undisputed that software for performing the claimed functions existed in the products when sold—in the same way that an automobile engine for propulsion exists in a car even when the car is turned off. [2]

We addressed a similar infringement scenario in *Fantasy Sports*, where we held that software for playing fantasy football could infringe a claim to a "computer for playing football." 287 F.3d at 1118. The defendants who sold the software argued that because their product was a "modifiable software tool," direct infringement occurred only when users configured it to play games. *Id.* at 1117. Rejecting this contention, we explained that "although a user must activate the functions programmed into a piece of software by selecting those options, the user is only activating means that are *already present in the underlying software*." *Id.* at 1118. Infringement occurred because the code "was written in such a way as to enable a user of that software to utilize the function . . . without having to modify that code." *Id.* That analysis applies here. The code for proactive scanning was "already present" in Defendants' accused products when sold. There is no evidence that customers needed to modify the underlying code to unlock any software modules. The fact that users needed to "activate the functions programmed" by pur-

---

[2] Defendants have not argued that the Webwasher software download product is not a "system" or "computer-readable storage medium."

chasing keys does not detract from or somehow nullify the existence of the claimed structure in the accused software. Therefore, the jury's infringement verdict on the system and media claims was based on a "legally sufficient evidentiary basis" and consistent with the "weight of the evidence." *Pediatrix*, 602 F.3d at 545-46 & n.9. That portion of the verdict is affirmed.

## B. Method Claims

In addition to the system and storage medium claims, Finjan asserted method claims from each of the three patents in suit. "To infringe a method claim, a person must have practiced all steps of the claimed method." *Lucent Techs. v. Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009).

Defendants claim that the trial record reflects a dearth of evidence on infringement of the method claims. Finjan responds with only two pieces of evidence. First, an engineer at Webwasher AG, Christopher Alme, testified in his deposition that a debug file (later introduced at trial) showed an "accurate depiction" of proactive scanning being "performed" by Webwasher AG. Transcript at 301:17-304:2. Second, Vigna testified that the same debug file showed performance of the claimed steps. *Id.* at 364:12-23. Finjan claims that a jury could reasonably infer from these statements that Defendants infringed.

We disagree with Finjan. The record shows that Alme worked on the Webwasher products in Germany for Webwasher AG, a German company. *See id.* at 1594:8-13; *id.* at 1153:6-7 ("So the product was made in Germany . . . ."). Therefore, Finjan showed at most that Webwasher AG performed proactive scanning on one occasion in Germany during testing, based on a single debug file. This fails to demonstrate direct infringement in the United States. *See* 35 U.S.C. § 271(a) (defining infringing

activities as occurring "within the United States"); *Gemtron Corp. v. Saint-Gobain Corp.*, 572 F.3d 1371, 1380 (Fed. Cir. 2009) ("Critically, it is the infringing act—making, using, offering to sell, selling, or importing—that must be within (or into) the United States."). Furthermore, Finjan identifies no evidence that Defendants infringed the method claims by testing or operating any copies of the accused products in the United States.[3]

Even construing this evidence most favorably to Finjan, no reasonable jury could have concluded that Defendants infringed the method claims. We therefore reverse the denial of Defendants' motion for JMOL of noninfringement on those claims.

## C. "Addressed to a Client"

Defendants argue that a new trial is required because the district court erred by failing to construe the term "addressed to a client." Each asserted claim of the '194 patent refers to a "Downloadable addressed to a client." We review claim construction de novo using the methodology in *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-19 (Fed. Cir. 2005) (en banc).

The parties offered competing definitions to the district court. Finjan argued that the phrase has an "ordinary meaning within the context of the clams." Pl.'s Opening Claim Construction Br. 10. Secure defined "addressed" as "containing the IP [Internet Protocol] address of the client computer," and "client" as "the computer from which the user is making a request." Def.'s Opening Claim Construction Br. 21-23. The district

---

[3] Finjan does not argue that the accused products were imported after being "made by a process patented in the United States," which could raise liability under 35 U.S.C. § 271(g).

court construed "addressed to a client" as having "its plain and ordinary meaning," but also observed that "the defendant's proposed construction would unjustifiably narrow the term's broad scope, which was not explicitly limited or redefined by the specification." *Finjan Software, Ltd. v. Secure Computing Corp.*, No. 06-CV-369, slip op. at 1 & n.1 (D. Del. Dec. 11, 2007). The jury did not receive a construction of "addressed to a client" but was told to "give the rest of the words in the claims their ordinary meaning." Final Jury Instructions 13.

According to Defendants, the district court shirked its responsibility to construe a disputed claim term by adopting "plain and ordinary meaning," violating the principles of *O2 Micro International Ltd. v. Beyond Innovation Technology Co.*, 521 F.3d 1351 (Fed. Cir. 2007). In *O2 Micro,* we held that the district court erred by assigning the term "only if" its plain and ordinary meaning because that definition "failed to resolve the parties' dispute." *Id.* at 1361. The parties disputed whether "only if" allowed for exceptions, but the district court did not answer this question, ruling that the phrase had "a well-understood definition." *Id.* In the absence of an authoritative construction, the parties argued the scope of the claim term to the jury. Remanding the case, we explained: "When the parties raise an actual dispute regarding the proper scope of the claims, the court, not the jury, must resolve that dispute." *Id.* at 1360.

No such error happened here. Unlike *O2 Micro,* where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction, which required an IP address. Later, at trial, it prevented the jury from reconstruing the term by stopping Defendants' expert, Dr. Dan Wallach, from repeating to the jury that the asserted claims require an IP address. Defs.' Principal Br. 55. In response, Defendants submitted an offer of

proof in which they proposed to have Wallach testify that "the ordinary meaning of 'addressed to a client' . . . refers to using the IP address of the client computer." Defs.' Offer of Proof Regarding "Addressed to a Client." By doing so, Defendants attempted to resurrect a claim construction that the district court already rejected, without offering a new definition. Restating a previously settled argument does not create an "actual dispute regarding the proper scope of the claims" within the meaning of *O2 Micro*. In this situation, the district court was not obligated to provide additional guidance to the jury. *See Verizon Servs. Corp. v. Cox Fibernet Va., Inc.*, 602 F.3d 1325, 1334 (Fed. Cir. 2010) (finding no *O2 Micro* problem where the parties "did not invite the jury to choose between alternative meanings").

Moreover, even on appeal, Defendants do not propose an alternative construction of "addressed to a client" or explain how a different definition would negate infringement of the '194 patent. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) (noting that "arguments not raised in the opening brief are waived"). "We may affirm the jury's findings on infringement . . . if correction of the errors in a jury instruction on claim construction would not have changed the result, given the evidence presented." *Teleflex Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1328 (Fed. Cir. 2002). Defendants are not entitled to a new trial on this ground.

## II. Damages

To review damages in patent cases, we apply regional circuit law to procedural issues and Federal Circuit law to substantive and procedural issues "pertaining to patent law." *Aero Prods. Int'l, Inc. v. Intex Recreation Corp.*, 466 F.3d 1000, 1016 (Fed. Cir. 2006); *see also Fiskars, Inc. v. Hunt Mfg. Co.*, 279 F.3d 1378, 1381 (Fed. Cir. 2002)

(noting that Federal Circuit law controls "the distinctive characteristics of patent damages law"). "In reviewing the propriety of a jury verdict, our obligation is to uphold the jury's award if there exists a reasonable basis to do so." *Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir. 1989).

Finjan sought a hypothetically negotiated royalty based on the factors in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). The parties presented opposing damages experts. Russell Parr, Finjan's expert, concluded that Finjan was entitled to $10.1 million, computed from an 18% royalty on $49.4 million in Webwasher software sales, an 8% royalty on $3.2 million of Webwasher appliance sales, and an 8% royalty on $12 million of Cyberguard TSP appliances sales. *See* Transcript at 645:1-647:22. Carl Degen, Defendants' expert, posited a total of $663,000 from a 4% royalty on all products. *See id.* at 1157:3-11. The jury awarded Finjan $9.18 million, consisting of a 16% royalty on $49,000,000 of Webwasher software sales, an 8% royalty on $3,250,000 of Webwasher appliance sales, and an 8% royalty on $13,500,000 of Cyberguard TSP appliance sales. Joint Special Verdict Form 10.

The district court denied Defendants' motions for JMOL and new trial, noting that "a reasonable jury could accept or reject either parties' take on the evidence, including the conflicting expert testimony in this case." *Memorandum* at 23.

## A. Royalty Base

Defendants raise two challenges to the royalty base, or total sales, that the jury used to compute damages. First, they claim that the jury misapplied the entire market value rule by using the full value of the accused products. *See Lucent*, 580 F.3d at 1336 ("For the entire

market value rule to apply, the patentee must prove that the patent-related feature is the basis for customer demand.") (quotations omitted). Second, they contend that the jury erroneously included sales to the U.S. government.

In response to the first challenge, Finjan again asserts waiver, arguing that Defendants waived their entire market value rule arguments by not raising them in their post-trial motions, and that they are estopped from challenging the application of the rule because Degen applied the rule himself. This time, we are persuaded that Defendants waived these contentions. In their post-trial motions, Defendants presented multiple objections to the jury's royalty base, including improper inclusion of sales to the government and the argument that locked products cannot infringe (which we have rejected). *See* Defs.'-Counterclaimants' Mot. for JMOL and New Trial 11-12; Defs.'-Counterclaimants' Opening Br. in Support 38-41. However, nowhere did Defendants raise the entire market value rule or argue that the royalty base for unlocked products should be less than their full sale value. Defendants may not raise these arguments for the first time on appeal. *See Srein v. Frankford Trust Co.*, 323 F.3d 214, 224 n.8 (3d Cir. 2003) ("We . . . will not consider issues that are raised for the first time on appeal absent compelling reasons.") (quotation omitted). Because we find these arguments waived, we need not address Finjan's estoppel argument.

In response to Defendants' second challenge, Finjan concedes that Parr incorrectly considered sales to the government. *See* Transcript at 669:20-21 ("Q: You also included sales to the federal government? A: Absolutely, yes."). This was impermissible because a patentee can recover damages only from the government for patented "use or manufacture for the United States." 28 U.S.C.

§ 1498(a). Nevertheless, this error does not require a new trial. The district court instructed the jury that sales "to the United States government should not be included in any damages calculation you perform." Final Jury Instructions 42. Jurors are "presumed to have followed" the instructions they were given. *Jones v. United States*, 527 U.S. 373, 394 (1999); *see also Citizens Fin. Group, Inc. v. Citizens Nat'l Bank*, 383 F.3d 110, 133 (3d Cir. 2004) ("This Court presumes that the jury followed the Court's instructions."). Defendants claim that the jury must have ignored these instructions because it accepted Parr's royalty base. In reality, the jury chose different numbers: for the Webwasher software it used a lower base ($49,000,000) than Parr did ($49.4 million), and for the Webwasher and Cyberguard hardware products it applied a higher base ($16,750,000) than Parr's ($15.4 million). While the jury's total base exceeds Parr's, the jury was entitled to choose its own figures from the evidence. Parr explained that infringing hardware sales could exceed his estimates due to Secure's unreported data. *See* Transcript at 647:1-648:8. Moreover, the record shows only $447,744 in "proactive module sales" to the United States. J.A. 5770. Because this total is small relative to the verdict and the jury chose numbers different than Parr's, Defendants fail to rebut the presumption that the jurors followed their charge.

## B. Royalty Rates

Defendants next claim that the jury's royalty percentages lack support under the *Georgia-Pacific* factors. The jury applied an 8% rate to the Webwasher and Cyberguard TSP appliances and a 16% rate to the Webwasher software.

Defendants disagree most with Parr's analysis of *Georgia-Pacific* factor 8: "The established profitability of

the product made under the patent; its commercial success; and its current popularity." 318 F. Supp. at 1120. Under this factor, a wide profit margin for accused products supports a higher reasonable royalty. *E.g.*, *Lucent*, 580 F.3d at 1335. Parr calculated royalty rates for the infringing products by examining Defendants' financial data from 2004 to 2007, after infringement began. He testified that his goal was to determine product-specific "operating profit," or "the profit margin of the products in question." Transcript at 614:19-23, 617:23-25. Parr's method was to determine the defendant companies' gross profits and then "eliminate expenses that are not related to the product," such as litigation settlement costs and research and development expenses for new (but not existing) products. *Id.* at 620:4-622:17. After determining operating profit margins for both the software and hardware products, he considered a variety of factors to conclude that the parties in a hypothetical negotiation would have agreed upon a "one-third/two-third split" of operating profit margins. *Id.* at 642:22-644:20. Using this method, Parr concluded that Defendants' operating profit margin was 25% for the hardware products and 55% for the software products, resulting in 8% and 18% royalty rates, respectively.

Defendants assail this methodology, claiming that Parr mistakenly relied on Secure's company-wide profits, not just those for the accused products. They also argue that Parr's adjustments to gross profits were unrealistic, making annual losses look like net gains by disregarding certain costs. Additionally, they fault Parr for ignoring a "Gross Margin Report" that showed Secure's product-specific profits, and for using financial data for irrelevant years. Finally, they challenge Parr's projected profit division as arbitrary.

We conclude that substantial evidence supports the jury's award. Parr admitted that he used Secure's company-wide, instead of product-specific, gross profits to calculate royalty rates. However, he explained to the jury that he found that the gross profit margin for the hardware products was similar to the company-wide margin (both roughly 70%), so that "the hardware products . . . have a gross profit margin . . . that's close." *Id.* at 624:17-625:6. He explained that this allowed him to adjust company-wide gross profits and use the resulting operating profit margin for the hardware products. Parr thus provided more than just a conclusory opinion, on which the jury was entitled to rely. Defendants' expert Degen agreed that company profit was relevant, saying: "Mr. Parr and I both rely, at least he tries to rely on product-specific profit. But I think it is instructive to just take a look at what the companies that were making the accused product have earned over time." *Id.* at 1118:10-15. For the software product, Parr set aside company profit and relied instead on testimony by a Secure executive, who stated that Secure's gross profit margin on software was 99%. *Id.* at 626:2-18, 683:1-18. While this departs from his methods for the hardware products, Parr again explained his analysis and based it on testimonial evidence.

Parr also justified his method of discounting certain expenses in Secure's financial statements to calculate operating profit. Parr claimed that he discounted 80% of Secure's research and development costs for future products, for example, because Secure's research expenses for unrelated products should not affect the value it obtained from using the patented invention. *Id.* at 621:1-8. Discounting these expenses significantly changed Defendants' operating profits: on cross-examination, Parr admitted that for 2006, Secure's financial statements reflected a *loss* of $17.8 million, but his calculations

converted this into a *profit* of $28 million. *Id.* at 662:16-25. However, we cannot foreclose the jury from relying on Parr's reasoning, which reflected adjustments to remove one-time costs and other expenses not related to product manufacture, sales, and marketing. Moreover, while Degen believed Parr's adjustments to be "wrong," he too made adjustments to gross profit and told the jury that "the differences between us in terms of those adjustments are relatively small." *Id.* at 1122:1-17.

Defendants' remaining objections to the profits analysis do not warrant retrial. They claim that Parr compiled his profit data from irrelevant years. Defs. Principal Br. 47-48. But Parr explained that he looked at profit margins only after Cyberguard began infringing sales, which was the date on which the hypothetical negotiation would have taken place. Transcript at 658:10-13. Parr's use of the actual profit margins that both Secure and Cyberguard experienced on products after that date was simply as a reflection of the profits the parties might have anticipated in calculating a reasonable royalty in the hypothetical negotiation. His testimony was subject to cross-examination, and the Defendants did not object to the use of actual profits in general as a basis on which to gauge expected profits in the hypothetical negotiation. The jury was free to consider Parr's testimony both on direct and on cross-examination. Parr disregarded a Gross Margin Report showing Secure's profits for Webwasher products for certain periods, but explained that he did so because the report did not separate profit margins for hardware and software. Transcript at 667:14-20. Additionally, the jury saw and considered the report because Defendants introduced it through Degen's testimony. *Id.* at 1129:20-1130:24. Finally, Defendants' objection to Parr's "one-third/two-third split" of operating profit margins as arbitrary is also unpersuasive. Parr considered the custom in

the industry, history of prior licenses, competitiveness of the parties, and the importance of the patented technology, among other factors, in concluding that the parties would have agreed that Finjan was entitled to 33% of the operating profit margin. *Id.* at 637:3-6; 643:8-644:20. Defendants' expert testified that the parties would have instead settled on Finjan receiving 25% of the operating profit margin. *Id.* at 1151:4-8. In explaining this "minor difference" between his opinion and Parr's, Degen attributed it to the fact that "[Parr] overestimates the level of competitiveness between the two firms." *Id.* at 1254:20-1255:1. In short, both parties' positions on profits were based on evidence and reasoned expert opinion, and we cannot second-guess the jury's independent views of either.

The parties also dispute *Georgia-Pacific* factor 11: "The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use." 318 F. Supp. at 1120. Defendants argue that the jury ignored the fact that not all customers enabled proactive scanning modules, and that "if no users activated modules containing proactive scanning, no revenue for that product was properly attributable to the patented invention." Defs.' Principal Br. 49. This argument confuses use by customers with use by infringers. Factor 11 looks to "how often a patented invention has been used *by infringers*." *Lucent*, 580 F.3d at 1333 (emphasis added). Here, the accused direct infringers are Defendants, not their customers. Because Defendants included proactive scanning on every accused product, their "use" encompassed all of their sales, regardless of customer activation. Degen noted that even if Cyberguard TSP purchasers did not unlock the proactive scanning modules, Secure obtained advertising value from those features. Transcript at 1116:5-11.

Next, Defendants address factors 10 and 13, which relate to "[t]he nature of the patented invention" and "[t]he portion of the realizable profit that should be credited to the invention." 318 F. Supp. at 1120. They argue again that their profits are not tied to proactive scanning but also include other software modules. Indeed, in *Lucent* we overturned a damages verdict for a software component, partly due to factors 10 and 13, because the component was a "tiny feature" and "[t]he parties presented little evidence relating to Factor 13." 580 F.3d at 1332-33. In this case, however, the jury heard evidence on which it could conclude that the patented inventions were far from being tiny features in the accused products. Parr testified that, based on Secure's internal documents, proactive scanning was "fundamentally important to the product," Transcript at 628:11-16, while Degen agreed after reviewing Secure and Finjan promotional materials that "[i]t's important technology. It was perceived as the next wave," *id.* at 1117:10-18. Those materials included statements emphasizing Secure's ability to "proactively protect" customers with "Webwasher Proactive Scanning." From this evidence, the jury could infer that a substantial fraction of the accused products' profits stemmed from proactive scanning.

Finally, Defendants claim that the jury failed to consider factor 1: "The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty." 318 F. Supp. at 1120. Defendants identify one license: an agreement between Finjan and Microsoft in which Microsoft acquired a worldwide license to Finjan's complete patent portfolio for a lump sum of $8 million. Defs. Principal Br. 51. In contrast, Finjan received $9.18 million for Defendants' infringement of three patents. We have recently reiterated that use of past patent licenses under factors 1 and 2

must account for differences in the technologies and economic circumstances of the contracting parties. *E.g., ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870-73 (Fed. Cir. 2010) (per curiam); *see also Wordtech Sys. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1319-20 (Fed. Cir. 2010). Here, Finjan noted multiple differences between the Finjan-Microsoft licensing scenario and a hypothetical negotiation with Defendants. Parr explained that Finjan did not compete with Microsoft but does compete against Secure; that Finjan received significant intangible value from Microsoft's endorsements of Finjan; and that the license involved a lump sum instead of a running royalty. These differences permitted the jury to properly discount the Microsoft license.

Finjan also introduced evidence under other *Georgia-Pacific* factors that Defendants ignore on appeal. The jury heard evidence that Finjan tends not to license its proactive scanning patents to competitors (factor 4), and that Secure competes directly with Finjan in the same line of business (factor 5). Finjan also noted that the patents do not expire until 2017 (the '194 and '780 patents) or 2021 (the '822 patent), and that long expiration dates support higher hypothetical royalty rates, particularly in the software industry (factor 7).

Despite potential flaws in Finjan's damages theory, "[t]he jury was entitled to hear the expert testimony and decide for itself what to accept or reject." *i4i*, 598 F.3d at 856. "In setting damages, the jury's function is to weigh contradictory evidence, to judge the credibility of the witnesses, and to resolve factual disputes," *C&F Packing Co. v. IBP, Inc.*, 224 F.3d 1296, 1304 (Fed. Cir. 2000)—provided that the record does not "rest on faulty assumptions and a lack of reliable economic testimony," *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1032 (Fed. Cir. 1996). In this case, we conclude that the jury's choice was "within the

range encompassed by the record as a whole." *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 519 (Fed. Cir. 1995). While Defendants insist that the jury blindly adopted Parr's analysis, ultimately the jury awarded lower total damages than Parr recommended ($9.18 million versus $10.1 million), including a lower royalty rate on Webwasher software sales (16% versus 18%). Because Defendants have not shown that the verdict is bereft of "a reasonable basis" in the record, *Motter*, 883 F.2d at 1230, we affirm the denial of Defendants' motions for JMOL or new trial on damages.

## III. Finjan's Cross-Appeal on Damages

After trial, Finjan sought to amend the judgment to include damages for infringing sales that the jury did not consider and that preceded entry of the permanent injunction. The district court granted Finjan additional damages by multiplying the jury's royalty rates against previously uncalculated sales but, without explanation, limited the accounting "to only those additional infringing sales that occurred up until the date of entry of the judgment in this case," or March 28, 2008. *Memorandum* at 25 & n.15. The court entered the injunction on August 28, 2009—roughly seventeen months after it entered judgment.

Finjan claims entitlement to damages for this seventeen-month period. We agree. Under 35 U.S.C. § 284, "the court *shall* award . . . in no event less than a reasonable royalty," and "[w]hen damages are not found by a jury, the court *shall* assess them" (emphases added). "Although courts have broad discretion in determining appropriate relief for patent infringement, . . . injunctions and damages must be tailored to the circumstances and be correlatively determined." *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, 72 F.3d 872, 881 (Fed. Cir.

1995) (quotation omitted). Accordingly, we have noted that a patentee is "not fully compensated" if "the damages award did not include future lost sales." *Id.* at 882; *see also Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1303 (Fed. Cir. 2009) ("A damages award for pre-verdict sales of the infringing product does not fully compensate the patentee because it fails to account for post-verdict sales of repair parts."). Therefore, the district court should have awarded compensation for any infringement prior to the injunction.

Defendants' sole response is that Finjan waived its right to further damages because its Amended Complaint sought only "such damages as it shall prove *at trial*." Defs.' Response & Reply Br. 35 (emphasis added). However, nothing in this statement forfeited the right to prove damages for sales that occurred after trial. Finjan's Amended Complaint also sought "[s]uch further and other relief as the Court and/or jury may deem proper and just." Am. Compl. for Patent Infringement 6. Moreover, Defendants identify no prejudice due to the timing of Finjan's motion. Like the district court, we reject Defendants' waiver argument. *Memorandum* at 25 n.15.

We therefore remand for the district court to determine appropriate damages for the period from March 29, 2008 to August 28, 2009.

## CONCLUSION

For the foregoing reasons, we affirm the denial of Defendants' motions for JMOL or new trial on infringement of Finjan's system and storage medium claims, but reverse the denial of their motion for JMOL of noninfringement of the method claims. We affirm the denial of Defendants' motions for JMOL or new trial on damages. Finally, we remand for the district court to assess post-judgment, pre-injunction damages.

## AFFIRMED-IN-PART, REVERSED-IN-PART, and REMANDED

COSTS

Each party shall bear its own costs.