NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**GLOBAL TRAFFIC TECHNOLOGIES LLC,**
*Plaintiff-Appellee*

**v.**

**RODNEY K. MORGAN, KM ENTERPRISES, INC.,**
*Defendants-Appellants*

**STC, INC.,**
*Defendant-Appellant*

---

2014-1537, 2014-1566

---

Appeals from the United States District Court for the District of Minnesota in No. 0:10-cv-04110-ADM-JJG, Judge Ann D. Montgomery.

---

Decided: June 4, 2015

---

CHAD DROWN, Faegre Baker Daniels LLP, Minneapolis, MN, argued for plaintiff-appellee. Also represented by JAMES W. PORADEK, TIMOTHY E. GRIMSRUD, LAUREN J. FRANK, TIMOTHY M. SULLIVAN, EVA BETH STENSVAD.

LOUIS W. TOMPROS, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, MA, argued for all defendants-

appellants.  Defendant-appellant STC, Inc. also represented by ANANT KUMAR SARASWAT; ROBERT ANTHONY ARCAMONA, Washington, DC.

JANA YOCOM RINE, Jana Yocom, P.C., Mount Vernon, IL, for defendants-appellants Rodney K. Morgan, KM Enterprises, Inc.

─────────────

Before DYK, O'MALLEY, and TARANTO, *Circuit Judges.*

O'MALLEY, *Circuit Judge.*

Global Traffic Technologies, LLC ("GTT") asserted U.S. Patent No. 5,539,398 ("the '398 patent") against Rodney Morgan, KM Enterprises, Inc., and STC, Inc. (collectively, "Appellants")[1] in the United States District Court for the District of Minnesota.  At trial, the jury found that Appellants willfully infringed, *inter alia*, method claims 16 and 17 of the '398 patent, awarding $5,052,118 in damages.  Because Appellants claim construction arguments regarding the method claims are waived, we affirm the finding of infringement and decline to address Appellants' claim construction arguments for the remaining system claims.  We also reverse the district court's imposition of enhanced damages under § 284, but affirm its conclusions regarding the sufficiency of GTT's marking, the admission of GTT's damages expert's testimony, and Morgan's personal liability.  Accordingly, we *affirm-in-part*, *reverse-in-part*, and *remand*.

─────────────

[1]    Although KM Enterprises, Inc. ("KME") and Morgan, the sole shareholder of KME, filed separate appellate briefs, we treat Appellants collectively except where noted.

## I. BACKGROUND

### A. The '398 Patent

The '398 patent asserted that there was a need to preempt the normal traffic signal programming for emergency vehicles—e.g., fire trucks and ambulances. The '398 patent explained that preemption would allow those vehicles to get to an emergency more quickly and safely. The '398 patent discussed that the prior art systems for preempting traffic signals were based on optical emitters or radio transmitters. According to the patent, these prior art systems were inadequate because they required a line-of-sight with the signal controller or suffered from range/location inaccuracies.

To solve these alleged deficiencies, the '398 patent purported to provide a traffic control preemption system for emergency vehicles that used data from a global positioning system ("GPS"). In the disclosed invention, each vehicle was equipped with a GPS receiver and a processor module to generate "navigational vehicle data, such as position, heading and velocity." '398 patent col. 3 ll. 51–53. Each intersection was equipped with a module that received the navigational vehicle data, determined if the vehicle was approaching that intersection, and decided whether to preempt the normal traffic signal programming.

Figure 1 is illustrative:



## *FIG.1*

'398 patent Fig. 1.  In Figure 1, the disclosed preemption system included a vehicle module 100 and an intersection module 200.  The vehicle module 100 included the GPS receiver, which received the GPS information from a GPS system 5.  The vehicle module 100 processed the GPS data and transmitted it "via transmitter 80 and antenna 101 to the intersection module 200."  '398 patent col. 5 l. 24–25.  The intersection module 200 received the data via

receiver antenna 210. The intersection module 200 then processed the vehicle data, and determined whether the vehicle was "within one of the allowed approaches to that intersection." '398 patent col. 5 ll. 47–48. If the vehicle was "within" one of those allowed approaches, the intersection controller 320 would adjust the traffic signal programming appropriately to allow the emergency vehicle to pass through the intersection.

Claim 16 is representative of the method claims on appeal:

16. A traffic control preemption method which uses data received from a global positioning system (GPS) to determine whether a vehicle, having an associated vehicle path, is allowed to preempt traffic signals at an intersection comprising the steps of:

(a) receiving GPS signals;

(b) processing the GPS signals on-board the vehicle so as to generate vehicle data;

(c) transmitting the vehicle data;

(d) providing a *map of allowed approaches*, wherein the map of allowed approaches comprises a plurality of preprogrammed allowed positions proximate to the intersection;

(e) comparing the vehicle data with the map of allowed approaches;

(f) determining based on a comparing step (e), whether the vehicle is within one of the allowed approaches; and

(g) allowing the vehicle to preempt the traffic signals associated with the intersection if the vehicle is within one of the allowed approaches.

'398 patent col. 10 ll. 43–63 (emphasis added). The italicized term is at issue in the present appeal.

## B. The Procedural History

STC, Inc. ("STC") partnered with KME, Morgan's company, to manufacture and distribute the EMTRAC GPS traffic preemption system ("EMTRAC").[2] STC was responsible for manufacturing EMTRAC, and KME and Morgan were responsible for marketing and selling the system. On September 30, 2010, GTT sued Morgan in the United States District Court for the District of Minnesota, alleging that EMTRAC infringed the '398 patent. On April 28, 2011, GTT amended its complaint to include Morgan's company, KME. GTT filed a separate complaint against STC on December 22, 2011, again alleging that EMTRAC infringed the '398 patent. The district court consolidated the two actions in response to a stipulated motion.

Prior to trial, the district court construed the disputed claim terms—including "map of allowed approaches," which was given its plain meaning. *Global Traffic Techs. LLC v. Emtrac Sys. Inc.*, No. 0:10-cv-4110, 2012 WL 2884846, at *5 (D. Minn. July 13, 2012) ("*Claim Construction Order*"). On September 20, 2013, the jury returned a verdict finding that KME, Morgan, and STC willfully infringed, *inter alia*, method claims 16 and 17.[3] The jury

---

[2]    EMTRAC is a traffic preemption system that uses GPS receivers on emergency vehicles to determine the vehicles' positions.

[3]    Because Appellants do not separately challenge dependent claim 17, we will only address independent method claim 16 on appeal. The jury also found infringement of certain system claims in the '398 patent. On appeal, Appellants challenge the construction of claim

awarded GTT $5,052,118 in damages for the infringement. The district court denied all of Appellants' post-trial motions for judgment as a matter of law ("JMOL"), finding that: (1) GTT adequately proved infringement of the method claims for the jury to find infringement, (2) Appellants' infringement was willful, (3) the testimony of GTT's damages expert was properly admitted, and (4) the jury properly found Morgan personally liable for infringement. *Global Traffic Techs. LLC v. Emtrac Sys. Inc.*, No. 0:10-cv-4110, 2014 WL 1663420 (D. Minn. Apr. 25, 2013) ("*JMOL Order*"). The district court also awarded GTT $2,526,059 in enhanced damages under § 284 (50% of the total damages award), $923,965 in prejudgment interest, and $1,384.14 per day in post-judgment interest.

Appellants timely appealed. We have jurisdiction under 35 U.S.C. § 1295(a)(1) (2012).

## II. DISCUSSION

### A. Claim 16

STC recognizes that, our analysis of claim 16 is potentially dispositive of its challenge to the jury's infringement verdict. *See* Oral Arg. at 0:09, G*lobal Traffic Techs. LLC v. Morgan*, 2014-1537, *available at* http://oralarguments.cafc.uscourts.gov/default.aspx?fl=20 14-1537.mp3 ("There are many issues raised in this appeal, but I would like to start with one that is case dispositive, and that is the construction of 'map of allowed approaches.'"). Specifically, if we affirm the district court's construction of "map of allowed approaches," because STC has asserted no other viable grounds upon which to attack the jury's verdict of infringement with respect to claim 16, that verdict will stand. And, because

---

terms in these system claims, but, as explained *infra*, we need not reach these constructions.

the method and system claims are allegedly infringed by the same products and conduct, STC does not contend that the number of claims infringed impacts the damages award, making an analysis of claim 1 and its claim terms unnecessary.

In its claim construction order, the district court found that "map of allowed approaches"—the only disputed term in claim 16—should be given its "plain meaning." *Claim Construction Order*, 2012 WL 2884846, at \*5. In explaining its ruling, and the dispute between the parties it was resolving, the district court expressly refused to include two specific limitations in this claim term: a geographical or "location-specific" one and one it characterized as redundant. *Id.* STC had urged that the term include a reference to the fact that the map be a "preprogrammed" map and that the court expressly inform the jury that "said map" is to be "stored at the intersection" "where the traffic signal that is to be preempted is located." *Id.* The district court rejected both suggestions. While the court agreed that the map referenced in claim 16 must be preprogrammed, the court found that fact to be expressly stated elsewhere in the claim, making its use as a modifier of map redundant. *Id.* The court also found, for reasons it had explained when assessing similar requests by STC for intersection-specific location limitations to be read into other claim terms in the '389 patent, that no location-specific limitation should be read into map of allowed approaches. *Id.* Because, in the absence of STC's requests for these specific limitations, the court found no other dispute between the parties regarding the meaning of this claim term, it afforded the phrase its plain meaning. Importantly, STC neither sought reconsideration of the court's order as to this term nor explained at any time before trial that the court misunderstood the points it was urging with respect to the phrase "map of allowed approaches." The case proceeded to trial and, after the jury returned its verdict

finding infringement of claim 16, the district court rejected STC's motion for JMOL, explaining that GTT presented evidence that the EMTRAC system performed each of the claimed steps, as the trial court had construed them. *JMOL Order*, 2014 WL 1663420, at *2–3.

On appeal, STC argues that the district court misconstrued "map of allowed approaches," and that there was insufficient evidence for the jury to find direct and indirect infringement of claim 16 under its proposed construction.

i. Claim Construction: "map of allowed approaches"

Claim construction is a matter of law, which we review de novo, but we review any underlying factual findings by the district court for clear error. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837–38 (2015). Generally, claim terms should be given their ordinary and customary meaning from the perspective of a person having ordinary skill in the art at the time of the effective date of the patent application. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). To ascertain the scope and meaning of the asserted claims, we look to the words of the claims themselves, the specification, the prosecution history, and any relevant extrinsic evidence. *Id.* at 1315–17. This inquiry, at times, begins and ends with the intrinsic evidence. In fact, the specification is the single best guide to the meaning of the claim terms; it is often dispositive. *Id.* at 1318 ("[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive . . . .'" (internal citations omitted)).

On appeal, STC argues that the district court should have construed the term "map of allowed approaches" as a "preprogrammed map of *routes* to the intersection where the traffic signal that is to be preempted is located, said map being stored at the intersection." STC's Br. 43 (emphasis added by STC). According to STC, the funda-

mental dispute between the parties as to this limitation is "whether an 'approach' can encompass a fixed area (like a rectangle on a map), or whether it requires movement (like a route)." *Id.* STC contends that the claims, specification, and figures make clear that the "allowed approaches" limitation requires measurement of movement along a path or route toward the intersection and do not encompass static detection zones. More specifically, STC contends that the map of allowed approaches must be created from data tracking vehicle movement along a path using multiple data points along that path. STC's Br. 44.

GTT responds that STC waived this argument because it never argued before the district court that the "allowed approaches" required movement toward an intersection. GTT contends that the specification and claim language makes clear that the "map of allowed approaches" can take any shape, including rectangular detection zones.

We agree with GTT that STC waived this argument by failing to raise it to the district court. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is a general rule, of course, that a federal appellate court does not consider an issue not passed upon below."). Although STC did argue that "map of allowed approaches" should mean "preprogrammed map of routes to the intersection where the traffic signal to be preempted is located, said map being stored at the intersection," its argument to the district court was that the map must be stored *at the intersection*; it never argued that a "route" required movement or a particular form of data point tracking. Joint Appendix ("J.A.") 5173–74.

In its claim construction brief, for example, while STC referenced the concept of a map of "paths," it only argued that the intrinsic evidence required that the "map of allowed approaches" (i.e., of its referenced paths) be

located at the intersection.  J.A. 5173–74; *see also* J.A. 5124 (arguing the same in the joint claim construction statement).  At the *Markman* hearing, moreover, STC confirmed to the court that the main dispute was over the physical location of the "map of allowed approaches." *See Global Traffic Techs., LLC v. Emtrac Sys., Inc.*, No. 0:10-cv-4110 (D. Minn. May 30, 2012), ECF No. 110, at 39:12–22 ("With regard to 'map of allowed approaches,' . . . our point in connection with this hearing, is that there is a specific, definable geographical location with regard to the location and the intersection which is separate from that geographical location which is definable with respect to the vehicle.").  GTT explained to the trial court that "the big dispute seems to be, what [STC's] main infringement argument seems to be, is that they store the maps of allowed approaches in the—physically in the vehicle computer unit as opposed to physically at the intersection, and our position is that none of these claims require a physical location limitation." *Id.* at 11:11–16.  STC not only did not dispute that characterization, it debated it head on. *Id.* at 32:2–5 ("The 200 series of numbers within the patent refer to the intersection module.  The mapping means is physically there.  The patent doesn't describe anything else, so that's the only way to construe that language."); *see also id.* at 39:23–25 ("Figures 1, 2 and 3 of the patent support [STC's] claim construction that 'map of allowed approaches' has this physical element where it is within the intersection module.").  Indeed, at the *Markman* hearing, GTT even characterized the allowed approaches as "rectangles," and STC never objected to that characterization.  *Id.* at 7:6–9 ("In the slide here, the rectangle's showing one of the allowed approaches to the intersection and its determining that this police car's in the allowed approach using this GPS technology.").

In its claim construction order, the district court rejected STC's "locational limitation" argument in finding that "map of allowed approaches" should be given its

plain meaning, but did not address whether the term required movement. *See Claim Construction Order*, 2012 WL 2884846, at \*5. As noted, following the claim construction order, STC never argued that the district court failed to address what they now claim is a fundamental dispute between the parties as to whether the "map of allowed approaches" requires movement or non-static directionality. *See* STC's Br. 43–47; Oral Arg. at 1:40. Tellingly, although STC requested construction of other claim terms after the *Markman* order, it never made its directionality argument before the district court. As a result we find STC's proposed construction of "map of allowed approaches" waived.[4]

Accordingly, we reject STC's argument that "map of allowed approaches" should be limited to a map of "movement along a path (toward the intersection)." STC's Br. 46.

### ii. Infringement

Because infringement was tried to a jury, we review the jury's finding of infringement for substantial evidence. *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 849 (Fed. Cir. 2010). It is sufficient for us to discuss indirect infringement. There is no substantial challenge on appeal to the sufficiency of the evidence to show the required underlying direct infringement—here, that Appellants' *customers* performed the steps of claim 16. As to the other elements of indirect infringement, the challenges on appeal fail based on meritlessness, waiver, or both.

---

4   Although STC argued at oral argument that it presented evidence at trial regarding the difference between the EMTRAC system and the system disclosed in the '398 patent, those arguments were directed at non-infringement, not claim construction. Oral Arg. at 6:07.

Putting to one side Morgan's argument about the alleged need for corporate veil-piercing, which we discuss below, appellants Morgan and KME argue only that they cannot be liable for indirect infringement unless they themselves directly infringed. That is incorrect. They can be liable for inducing or contributing to the direct infringement of their customers. Moreover, KME did not preserve a sufficiency challenge to indirect infringement through the required JMOL motions in the district court.

STC, for its part, contends that GTT failed to present sufficient evidence that it proceeded with the knowledge respecting the patent that is required to establish indirect infringement. GTT argues that STC waived these arguments by failing to present them in the required JMOL motions in the district court. We agree.

Although STC challenged the jury's finding of infringement of claim 16, it only argued that there was insufficient evidence that the EMTRAC system performed every claimed step. *JMOL Order*, 2014 WL 1663420, at *2–3. The district court properly rejected this argument and STC does not appeal this conclusion. We, therefore, agree with GTT that STC waived its new indirect infringement arguments made on appeal. *Singleton*, 428 U.S. at 120.

In addition to waiving these new arguments, they are without merit. GTT presented ample evidence that all accused infringers had affirmative knowledge of the '398 patent, had no reasonable non-infringement defense for claim 16 (see *Commil USA, LLC v. Cisco Systems, Inc.*, No. 13-896, 2015 WL 2456617 (Sup. Ct. May 26, 2015)), and indeed willfully blinded themselves to their infringement of at least claim 16, and the jury was free to credit that evidence. *See, e.g.*, J.A. 1734 ("we chose not to read it"); J.A. 1779:18–1780:15 (explaining that Morgan and STC had knowledge of the '398 patent when they started developing updates to the EMTRAC system). Because

Appellants do not challenge the jury instruction, affirming indirect infringement alone is sufficient to uphold the jury's verdict. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1222 (Fed. Cir. 2014) (holding that a general verdict will not be set aside if there is sufficient evidence to support any of the alternative factual theories so long as there is no dispute over the legal propriety of the jury instruction).[5]

## B.  Enhanced Damages Under Section 284

The district court concluded that GTT was entitled to enhanced damages because it had proven successfully that Appellants willfully infringed the patent.  The district court explained that Appellants' actions were objectively unreasonable because "an objectively reasonable person, with knowledge that a patent exists in the field in which the potential infringers wish to compete would not ignore the patent, but would investigate whether its design would infringe." *JMOL Order*, 2014 WL 1663420, at *13.  As the district court noted, moreover, the jury found that GTT proved by clear and convincing evidence that Appellants actually knew or should have known that their actions constituted an unjustifiably high risk of infringement.  As a result, the district court awarded GTT enhanced damages under § 284 in the amount of $2,526,059 (50% of the total damages award).

---

[5]  GTT also presented evidence that Appellants themselves performed the patented method by testing and supporting the EMTRAC system. *See, e.g.*, J.A. 1693:23–1694:2 (testifying that Appellants would make the EMTRAC systems, test it, and then ship it to customers). Because we uphold the jury's finding of infringement based on indirect infringement, however, we need not decide whether the evidence of direct infringement is sufficient to maintain the entirety of the damages award. *See Ericsson*, 773 F.3d at 1222.

Section 284 states in relevant part that "the court may increase the damages up to three times the amount found or assessed." A patentee must show that he is entitled to enhanced damages by showing that the infringer willfully infringed. *In re Seagate Tech., LLC*, 497 F.3d 1360 (Fed. Cir. 2007) (en banc). *Seagate* sets out a two-part test for proving willfulness where the patentee must show that: (1) "the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent," and (2) the "objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer." *Id*. at 1371. The first question is for the court; the second is for the jury. *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 682 F.3d 1003, 1007 (Fed. Cir. 2012). We review the first prong de novo and the second prong for substantial evidence. *SSL Servs., LLC v. Citrix Sys., Inc.*, 769 F.3d 1073, 1090–91 (Fed. Cir. 2014).

On appeal, Appellants challenge the district court's analysis of the first prong. We conclude that the district court applied the wrong standard in its analysis of that prong. The district court found that there was ample evidence in the record that Appellants knew of the patent and determined that "an objectively reasonable person, with knowledge that a patent exists in the field in which the potential infringers wish to compete would not ignore the patent, but would investigate whether its design would infringe." *JMOL Order*, 2014 WL 1663420, at *13. The infringer's knowledge of the patent is irrelevant to the first *Seagate* prong, however. *See Seagate*, 497 F.3d at 1371 ("The state of mind of the accused infringer is not relevant to this objective inquiry."). Instead, the district court should have considered whether Appellants acted "despite an objectively high likelihood that its actions constituted infringement of a valid patent." *Seagate*, 497 F.3d at 1371. This requires analysis of all of the infring-

er's non-infringement and invalidity defenses, even if those defenses were developed for litigation. *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 769 F.3d 1371, 1382 (Fed. Cir. 2014) ("The court properly considered the totality of the record evidence, including the obviousness defense that Pulse developed during the litigation, to determine whether there was an objectively-defined risk of infringement of a valid patent.").

In this case, the district court found that Appellants "had good-faith invalidity defenses once litigation began." *JMOL Order*, 2014 WL 1663420, at *14. We agree. Because Appellants' defenses during litigation were objectively reasonable, GTT failed to prove the first prong of our willfulness test. *See Halo*, 769 F.3d at 1382. As a result, we reverse the district court's award of enhanced damages under § 284.

## C. Marking

GTT makes and sells the Opticom GPS System ("the Opticom system"). There is no dispute that the Opticom system embodies at least one claim of the '398 patent. GTT argued that Appellants received constructive notice of the '398 patent because, although GTT did not mark the physical components in the system, it did mark the packaging in which the Opticom system was sold. The district court instructed the jury to determine whether marking the packaging was sufficient to meet GTT's marking requirement under § 287. The jury found that GTT adequately marked Opticom and, based on that conclusion, awarded damages from the date Appellants started selling the EMTRAC system, rather than the date on which GTT filed this lawsuit. The district court upheld the jury's finding in response to Appellants' motion for JMOL.

On appeal, Appellants argue that GTT failed to comply with the marking statute because it marked the packaging of its patented products rather than the indi-

vidual products themselves, even though there was sufficient physical space on the components of the Opticom system for marking. In essence, Appellants ask us to hold as a matter of law that, if there is physical space on any component of a patented system, the patentee must mark that component to comply with the marking statute.

Section 287(a) states in relevant part:

> Patentees . . . may give notice to the public that [any patented article] is patented, either by fixing thereon the word "patent" or the abbreviation "pat." together with the number of the patent . . . or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice.

35 U.S.C. § 287(a). As the statute states, marking of "any patented article" is necessary if, "from the character of the article," it can be marked. *Id.* In this case, the "patented article" is a system such that the "character of the article" is defined by more than the physical surfaces on its component parts. *Id.* Because the purpose of the marking statute is to provide constructive notice to the public, moreover, we apply a rule of reason analysis in determining when "substantial compliance may be found to satisfy the [marking] statute." *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996).

As noted, the marking statute requires an analysis of the "character of the article." 35 U.S.C. § 287(a). Certainly, the physical size of the article may be one factor in considering whether the article itself must be marked rather than the packaging. *See Sessions v. Romandka*, 145 U.S. 29, 49–50 (1896) (considering the patentee's ability to stamp the patented screws with a legible mark based on the size of the screws). The physical size of the patented article, however, is not the only thing that defines the "character of the article." 35 U.S.C. § 287(a).

There may be many other aspects of a patented article that can affect whether marking the article provides sufficient constructive notice to the public. *See Maxwell*, 86 F.3d at 1111. Because we do not pretend to know all of the possible types, characteristics, or components of patented—and yet to be patented—machines and systems, we cannot construct a bright line rule regarding what aspects to consider in determining whether marking the packaging amounts to "substantial compliance." *Id.* One example is a multi-component system that embodies a patent. In this example, marking the individual components of the system may not have the desired notice effect of providing public notice because such markings may mislead the public into believing that the marked components themselves are patented, as opposed to the entire multi-component system. As another example, patented articles may be immediately installed out of the public view once unpackaged. Again, in this example, the public may be better notified with marking on the packaging, as opposed to the article itself.

We use these examples to show that the physical size of the article is not the only aspect of the "character of the article" that may be considered. 35 U.S.C. § 287(a). Because there may be many factors that affect the character of a patented article, we hold that, when a patentee marks the packaging rather than the article, the district court should evaluate the specific character of the article at issue. *See Sessions*, 145 U.S. at 50 ("[S]omething must be left to the judgment of the patentee, who appears in this case to have complied with the alternative provision of the act, in affixing a label to the packages in which the [patented articles] were shipped and sold."). This factual inquiry regarding the character of the patented article, moreover, may be submitted to a jury, as the district court did here.

In this case, there was substantial evidence for the jury to find that GTT substantially complied with § 287 by

marking the Opticom packaging. Appellants presented evidence that their patented product was an entire system that contained multiple components that were separated once unpackaged. J.A. 1980:9–16 ("My understanding is the thought around the packaging is that the, again, this is a system. It's all the components functioning together. The only time the system is really together is when it is shipped from the manufacturer. So that's the only time that all the components are together."). Appellants' expert also testified that some of the components are not in the public view once installed and that other companies had marked the product in the same way, that the marking used reflected industry custom. *See* J.A. 1980:24–1981:9 ("And then when they are installed, in many cases, the face selector, for example, is installed inside of a traffic control cabinet. That cabinet is locked. It's out of public view. The mast arm radio that you saw earlier is mounted on top of a mast arm or a pole that the signal lights are hanging on. It's mounted up on top of that. That's high up and out of public view. The vehicle components as well, one component could be in the trunk of a police car, a bus, for example. The component could be in an equipment cabinet, again locked, excuse me, out of the public view."); J.A. 1979:10–19 (testifying that 3M marked Opticom the same way before GTT acquired the technology). Based on these factors, it was reasonable for the jury to conclude that marking the packaging of Opticom—the only time when all of the components that made up the patented system were together and in full view of the public—adequately served the purpose of providing constructive notice to the public that the entire Opticom system was patented.

For the foregoing reasons, we uphold the jury's finding that GTT complied with the marking statute.

### D.  GTT's Expert's Testimony

The district court found that it properly allowed testimony by GTT's damages expert at trial.  We review the admission of expert testimony under the law of the regional circuit—here, the Eighth Circuit.  *Ericsson*, 773 F.3d at 1225.  The Eighth Circuit reviews the admission of expert testimony for abuse of discretion.  *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 928 (8th Cir. 2001).

On appeal, Appellants argue that the district court breached its gatekeeping obligation under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), by failing to exclude GTT's damages expert's trial testimony.  Appellants contend that GTT's expert failed to consider price elasticity in his testimony at trial, providing no economic evidence to support his theory.  That is not so: GTT's expert did testify to price inelasticity at trial.  *See* J.A. 2100, 2102.  As GTT points out, moreover, GTT's expert's testimony was based on the analysis in his expert report, which elaborated on price elasticity.  Appellants do not argue that GTT's expert departed from the methodology described in his report, or that the methodology in his report was improper.  Appellants had the opportunity to cross-examine GTT's expert and could have asked him about price elasticity at trial.

We, therefore, affirm the district court's denial of Appellants' motion for JMOL regarding the exclusion of GTT's damages expert's testimony.

### E.  Personal Liability of Morgan

The district court denied Morgan's motion for JMOL that he was not personally liable for infringement.  We review a district court's denial of JMOL under the law of the regional circuit.  *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1202 (Fed. Cir. 2010).  The Eighth Circuit reviews a district court's grant or denial of JMOL de novo, applying the same standard as the district court.

*Synergetics, Inc. v. Hurst*, 477 F.3d 949, 956 (8th Cir. 2007). To grant a motion for JMOL, we must find that "there is no legally sufficient evidentiary basis to support a jury verdict in the non-moving party's favor." *Id.* (citing Fed. R. Civ. P. 50(a)(1)).

On appeal, Morgan argues that GTT never alleged that Morgan was individually liable as an infringer, only that Morgan was liable as the sole shareholder and director of KME. Morgan also contends that, as KME's corporate officer, he cannot be found personally liable for infringement absent a finding that the corporate veil should be pierced. GTT responds that it explicitly pled that Morgan was personally liable in its amended complaint and throughout the course of litigation. GTT insists that there was ample evidence that Morgan *personally* induced infringement under § 271(b).

We agree with GTT that it adequately alleged that Morgan was individually liable as an infringer, starting with the complaint and continuing through trial. We also agree with GTT that the jury had a sufficient basis to find that Morgan personally induced infringement based on his own actions, and was therefore directly liable. Accordingly, there was no need to pierce the corporate veil to find Morgan derivatively liable for KME's infringement. As we explained in *Wordtech Systems, Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308 (Fed. Cir. 2010), "'corporate officers who actively assist with their corporation's infringement may be personally liable for inducing infringement *regardless* of whether the circumstances are such that a court should disregard the corporate entity and pierce the corporate veil.'" 609 F.3d at 1316 (quoting *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990)). In this case, GTT presented substantial evidence to indicate that Morgan personally induced customers to perform the patented method in claim 16 of the '398 patent. *See, e.g.*, J.A. 1757:20–1760:20 (testifying that he *personally* helped cities use the

EMTRAC system and got his "hands dirty every day, installing, testing, repairing and developing" the EMTRAC GPS product). The jury reasonably found that Morgan is personally liable for his own actions that constituted induced infringement under § 271(b), without piercing the corporate veil. *See Wordtech*, 609 F.3d at 1316; *see also United States v. Trek Leather, Inc.*, 767 F.3d 1288, 1299 (Fed. Cir. 2014) (en banc) ("[A] person who personally commits a wrongful act is not relieved of liability because the person was acting for another.").

Furthermore, GTT made it clear that it was only alleging induced infringement against Morgan and all of its evidence of Morgan's involvement was focused on proving induced infringement. *See* J.A. 1015:2–4 ("[We are] pursuing individual liability for Rodney Morgan only under an inducement theory under Section 271."); J.A. 1757:18 ("And, now, we're talking about indirect infringement."). Furthermore, Morgan does not challenge the district court's jury instruction on appeal.[6]

---

[6]     In *Wordtech*, this court stated that "the 'corporate veil' shields a company's officers from personal liability for direct infringement that the officers commit in the name of the corporation, unless the corporation is the officers' 'alter ego.'" 609 F.3d at 1313. We do not believe this statement represents a departure from the traditional rule that a person is personally liable for his own tortious actions, even if committed as a corporate officer. *See Trek Leather*, 767 F.3d at 1299 ("It is longstanding agency law that an agent who actually commits a tort is generally liable for the tort along with the principal, even though the agent was acting for the principal. That rule applies, in particular, when a corporate officer is acting for the corporation." (citations omitted)). Instead, we interpret *Wordtech* as reinforcing the rule that a corporate officer—or perhaps only a corporate owner, *see*

Accordingly, we affirm the infringement verdict against Morgan and in favor of GTT.

### III. CONCLUSION

For the foregoing reasons, we affirm the jury's finding of infringement of the asserted method claims of the '398 patent—claims 16 and 17—but reverse the district court's imposition of enhanced damages under § 284. We also affirm the jury's finding that GTT complied with the marking statute, the district court's findings that GTT's damages expert's testimony was properly admitted, and the infringement verdict against Morgan. We remand for the district court to enter judgment consistent with this opinion.

**AFFIRMED-IN-PART, REVERSED-IN-PART, REMANDED**

---

*Wordtech*, 609 F.3d at 1313 n.2—cannot be found derivatively liable for *the corporation's infringement* without piercing the corporate veil. *See, e.g.*, *Manville*, 917 F.2d at 552 ("For Butterworth and DiSimone, officers of Paramount, to be personally liable *for Paramount's infringement* under section 271(a), there must be evidence to justify piercing the corporate veil." (emphasis added)); *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1579 (Fed. Cir. 1986) ("To determine whether corporate officers are personally liable for the *direct infringement of the corporation* under § 271(a) requires invocation of those general principles relating to piercing the corporate veil." (emphasis added)). Because GTT only argues that Morgan induced infringement in this case, however, we need not reach this issue.